STATE OF NORTH CAROLINA v. ANTHONY D. NELSON AND JAVAN JOLLY

No. 106

(Filed 4 December 1979)

1. **Searches and Seizures § 3— warrantless inventory search by military authorities of soldier's billet—subsequent "second look" at inventoried items**

    A warrantless search by military authorities of a military billet of a soldier detained by civilian authority, or otherwise absent without leave, to make an inventory of his belongings and to secure them for safeguarding pursuant to military regulation without any investigative purpose was not an unreasonable search or seizure proscribed by the Fourth Amendment. Furthermore, a "second look" by military authorities at some of the inventoried and secured items three days later did not constitute another search subject to Fourth Amendment proscriptions.

2. **Criminal Law § 84; Searches and Seizures § 3— inventory search by military authorities—admissibility of items in civilian trial**

    Evidence obtained by military authorities in an inventory of soldiers' possessions was not required to be excluded in a civilian criminal trial of the soldiers on the ground that the surrender of the evidence by military to civilian authorities violated the Posse Comitatus Act, 18 U.S.C. 1385, since (1) a violation of the Act would not call for invocation of the exclusionary rule, and (2) such passive activities of military authorities which incidentally aid civilian law enforcement are not precluded by the Act.

3. **Criminal Law § 92— antagonistic defenses by two defendants—test of whether severance required**

    The test of whether antagonistic defenses by two defendants required severance of their trials is whether the conflict in defendants' respective positions at trial was of such a nature that, considering all of the other evidence in the case, defendants were denied a fair trial.

4. **Criminal Law § 92— two defendants—when severance of trials required**

    A severance of the trials of two defendants should ordinarily be granted where their defenses are so irreconcilable that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty, or where their defenses are so discrepant as to pose an evidentiary contest more between defendants themselves than between the State and the defendants.

5. **Criminal Law § 92.1— inconsistent testimony by two defendants—severance not required**

    Although the two defendants in a rape, burglary and armed robbery trial gave inconsistent testimony as to whether the first defendant loaned the second defendant his car on the date of the crimes and whether jewelry found in the first defendant's locker was sold to him by the second defendant, defendants were not denied a fair trial by the refusal of the trial court to sever their trials since the State itself offered plenary evidence of both defendants' guilt and did not simply stand by and rely on the testimony of defendants to

convict them; neither defendant testified directly to the other defendant's guilt and both defendants denied any participation in the crimes; each defendant was subject to cross-examination by the other; the first defendant could have testified to the same matters tending to implicate the second defendant at a separate trial of the second defendant; and the conflict between each defendant's respective testimony was not of such magnitude when considered in the context of other evidence that the jury was likely to infer from that conflict alone that both were guilty.

6. **Criminal Law § 92.1— joinder of defendants' trials—evidence competent against one considered against both—absence of objection**

Joinder of defendants' trials was not erroneous because evidence competent against only one defendant was allowed to be considered against both and the trial judge, in reviewing the evidence against one defendant, alluded to items of stolen jewelry which the State's evidence tended to show were found in the second defendant's locker, where defendants failed to make timely objection to the evidence and motions for limiting instructions and failed to object to the court's recapitulation of the State's evidence.

7. **Attorneys at Law § 6— codefendant represented by defendant's former counsel—necessity for showing of prejudice**

Prejudice warranting a new trial does not automatically result to a defendant whose codefendant is represented by counsel who formerly represented both defendants when testimonial conflicts between defendants develop at trial. Rather, a new trial is warranted only when defendant can show actual prejudice, which means more than a defendant's having been damaged at trial by the actions of his former attorney and requires that the record show that the attorney took advantage of the former relation in some way at the subsequent trial or that the former relation put the attorney in a better position to inflict the damage than he otherwise would have had.

8. **Attorneys at Law § 6— codefendant represented by defendant's former counsel—absence of prejudice**

Defendant failed to show prejudice arising from having his former lawyer represent his codefendant at trial where questions asked defendant by his former attorney on cross-examination and the former attorney's jury argument did not suggest that they were engendered by information obtained during the former relation or that the former relation put defendant at any other disadvantage at his trial, and where defendant acquiesced in his former attorney's representation of the codefendant by failing to object at trial.

9. **Jury § 9— inability of juror to attend session on Saturday—replacement with alternate juror**

The trial court did not abuse its discretion in excusing a juror and substituting an alternate juror when the juror indicated that she could not attend a session of court on Saturday.

10. **Criminal Law § 33— holster and ammunition in defendant's car—irrelevancy—harmless error**

In this prosecution for burglary, rape and armed robbery in which the victims testified that their assailants were armed with a "short golden type or

silver pistol," evidence that a holster and box of small caliber bullets were discovered in one defendant's car at the time of defendants' arrest six days after the crimes, if irrelevant, was not prejudicial where such evidence constituted only an insignificant part of the State's case, and there is no reasonable basis to believe the jury would have returned a different verdict had the evidence been excluded.

**11. Burglary and Unlawful Breakings § 6.4— propriety of instructions on constructive breaking**

The trial court properly instructed the jury on constructive breaking in a burglary case where the evidence tended to show that one of the defendants pointed a gun at the male victim as he was standing at the door of his motel room; when the female victim opened the door she saw the gun pointed at the male victim's head; the male victim was then "kind of shoved into the room"; and neither defendant was given permission to enter the room.

**12. Burglary and Unlawful Breakings § 7— first degree burglary—refusal to submit lesser offenses**

The trial court in a first degree burglary case did not err in refusing to submit the lesser included offense of felonious breaking and entering where the evidence tended to show only a burglarious breaking; nor did the court err in refusing to submit second degree burglary where the uncontradicted evidence showed that the sleeping apartment in question was occupied when defendants gained entry thereto.

**13. Burglary and Unlawful Breakings § 6— motel room as "sleeping apartment"—expression of opinion—harmless error**

The trial court's statement to the jury that the motel room in question was a "sleeping apartment" for purposes of applying the law of burglary constituted an impermissible expression of opinion or an assumption that a material fact had been proved in violation of G.S. 15A-1232; however, such error was harmless since there can be no serious contention that a motel room, regularly and usually occupied by travelers for the purpose of sleeping, is not in fact a "sleeping apartment" within the meaning of the law of burglary, defendants did not contest the "sleeping apartment" issue at trial other than by their general pleas of not guilty, and there is no reasonable possibility that this error contributed to defendant's conviction.

**14. Criminal Law § 33.1— evidence of investigation of another person—absence of prejudice**

In a criminal prosecution in which an officer testified that the victims had selected the photograph of a person other than defendant from a police photograph book, defendant was not prejudiced by the officer's irrelevant testimony about his subsequent investigation of the other person since the inference raised by the evidence was favorable to defendant.

**15. Criminal Law §§ 84, 89.6— use of suppressed receipt to refresh recollection**

The State's presentation to defendant of a receipt which had previously been suppressed *as evidence*, the court having found that it was seized in an unconstitutional search, for the purpose of refreshing his recollection of the

State v. Nelson

date his car had been repaired did not constitute the use of "tainted evidence" to impeach defendant. Even if showing the receipt to defendant was error of constitutional dimension, the error was harmless since the date defendant's car was repaired was immaterial to the crimes charged and the receipt could not have contributed in any way to defendant's conviction.

16. **Criminal Law §§ 66.6, 66.15 — lineup — officer's remark that witness picked "right person" — courtroom identification not tainted**

A witness's courtroom identification of defendant was not rendered inadmissible on the ground of improper out-of-court suggestiveness because an officer had told the witness after she picked defendant in a lineup that she had picked the "right person" since (1) the witness did not make an independent identification of defendant in court but merely identified defendant as the man she chose in the lineup, and the lineup was properly found by the court to be free from undue suggestiveness; (2) even if the identification at issue was an in-court accusatory identification, it was not fatally tainted by pretrial suggestiveness because the officer's remark did not serve in this case to strengthen an initially tentative identification; and (3) even if the comment raised an aura of suggestiveness around the totality of the pre-trial identification process, the suggestiveness did not give rise to a substantial likelihood of misidentification at trial where there was plenary evidence of the inherent reliability of the witness's courtroom "identification" of defendant, and the ample opportunity of the witness to view the events and actors at the time of the crimes supports a conclusion that her in-court "identification" of defendant had an origin sufficiently independent of the taint of a single improper remark.

17. **Criminal Law § 66 — touching defendant on shoulder to identify**

The trial court did not err in permitting a witness to touch one defendant on the shoulder to identify the person about whom she was testifying.

18. **Searches and Seizures § 43 — motion to suppress at trial not timely**

The trial court did not err in the denial of defendant's motion at trial to suppress a watch seized pursuant to a search warrant where there was no contention that defendant did not have a reasonable opportunity to submit the motion prior to trial as required by G.S. 15A-975, and there was no suggestion that other circumstances existed which, under the statute, would permit a motion to suppress made at trial, it not being impermissible for the State to impose reasonable conditions on the assertion of motions to suppress evidence.

Justice CARLTON did not participate in the consideration or decision of this case.

APPEAL by both defendants from *Judge Brewer* at the 25 September 1978 Criminal Session of CUMBERLAND Superior Court. Both defendants were convicted of first degree rape, first degree burglary, and armed robbery. Nelson was sentenced to two consecutive life sentences on the rape and burglary charges and to a term of imprisonment of not less than ten nor more than twenty

years on the armed robbery charge to begin at the expiration of the second life sentence. Jolly was sentenced to two consecutive life sentences on the rape and burglary charges and to a term of imprisonment of not less than twenty nor more than twenty-five years on the armed robbery charge to begin at the expiration of the second life sentence. This case was argued as No. 106 at the Spring Term 1979.

*Rufus L. Edmisten, Attorney General, by T. Buie Costen, Special Deputy Attorney General, and Grayson G. Kelley, Associate Attorney, for the State.*

*Neill Fleishman, Attorney for defendant Jolly.*

*Fred J. Williams, Assistant Public Defender, Attorney for defendant Nelson.*

EXUM, Justice.

These appeals present a number of questions, the most important of which are raised by both defendants and involve (1) the legality of a warrantless search of defendants' military billets and seizure therefrom of varous items by military authorities and the ultimate delivery of some of these items to civilian authorities for use as evidence against defendants; and (2) the consolidation for trial of the charges against each defendant. We find no error in these procedures or in any other aspect of the trial.

The evidence for the state tends to show that on 16 December 1977, Margaret and Eugene Macek, who were returning to their home in Newcastle, Pennsylvania, following a honeymoon trip to Florida, stopped for the night at Motel 6 in Cumberland County. After registering they drove their car to a parking place in front of their assigned room. Both went inside briefly. Mr. Macek, after instructing his wife to lock the door and to admit no one other than him, returned to the car to get their luggage. Moments later Mrs. Macek heard a knock at the door, and her husband identified himself. When she opened the door, two black males were standing behind her husband. One of them had a small gun pointed at her husband's head. Both men, forcing Mr. Macek ahead of them, entered the room. They forced Mr. and Mrs. Macek to disrobe and bound and gagged Mr. Macek. The men then forced Mrs. Macek to submit to repeated sexual inter-

course and fellatio with them. They then bound and gagged Mrs. Macek and sexually assaulted her with a tube of toothpaste. The two assailants fled, taking with them money and jewelry belonging to the couple.

Both defendants were arrested on 22 December 1977 in connection with another incident at the Americana Motel involving Evelyn and Morris Friedman.[1] Defendants were soldiers stationed at Ft. Bragg. Items discovered in their billets at Ft. Bragg ultimately linked them to the Macek incident. These items consisted of a watch and jewelry identified by the Maceks as having been taken from them on 16 December. Nelson was identified by both Mr. and Mrs. Macek at separate lineups. Neither could identify Jolly, but his fingerprints were found on the previously mentioned tube of toothpaste.

Jolly testified that he had loaned his car to Nelson on 16 December 1977. He said Nelson sold him the Macek jewelry found among his belongings.

Nelson testified that he asked to borrow Jolly's car but never actually borrowed it. He further testified that he had purchased from an unidentified man Mr. Macek's watch. He said he had not sold the Macek jewelry to Jolly and had never before seen it.

I

[1] After defendants were arrested and confined to the county jail on 22 December 1977 military personnel at Ft. Bragg, pursuant to military regulations,[2] entered their military billets on 24

---

1. In connection with this incident Jolly was tried and convicted at the 10 July 1978 Session of Cumberland Superior Court of burglary in the first degree and armed robbery. He received a sentence of life imprisonment on the burglary charge and a consecutive sentence of ten to fifteen years imprisonment on the robbery charge. This Court found no error in this proceeding. *State v. Jolly,* 297 N.C. 121, 254 S.E. 2d 1 (1979).

2. The military regulations relied on are found in U.S. Army Field Manual 27-1, "Legal Guide for Commanders," Paragraphs 2:9(c), 10:6, and 10:7 (September 1974). They provide in pertinent part as follows:

"2:9(c). *Inventories.* When a solider is AWOL, about to be confined, or detained by civilian authorities, an inventory of the soldier's personal belongings is required : . . . Evidence obtained as a result of this inventory is admissible in a court martial.

10:6. *General.* Whenever a soldier is absent from his unit under other than normal circumstances, the unit commander has a duty to insure that the personal and organizational property of the soldier is protected from theft, damage, or loss. Even if the absence of the soldier is due to his own misconduct, the duty to protect his property does not change. Remember that failure to comply with army regulations may result in claims against the Army. This duty will require the unit commander to enter the area of the absent soldier and may require him to forcibly enter wall lockers and footlockers so that a complete inventory can be made.

10:7. *AWOL Personnel.* Immediately upon being notified that a member of his unit is AWOL, the commander will select an officer, warrant officer, or noncommissioned officer . . . to inventory all property left behind by the soldier."

December for the purpose of making inventory of their property. Lt. Gorwitz, who conducted the inventory in Nelson's billet, testified, "Every time a person is in confinement or gone for more than 24 hours we are required to inventory the equipment and secure it." Nelson had been gone for more than 24 hours. After being inventoried the property of both Nelson and Jolly was secured.

Lt. Gorwitz and Sgt. Cromartie, both assigned to "C" Battery, 1st Battalion, 39th Field Artillery (Nelson's unit), inventoried Nelson's property on 24 December. After reading a newspaper account of the Macek incident which included a description of some of the jewelry taken from the Maceks, then Lt. Wood, Nelson's Battery Commander,[3] personally viewed on 27 December the items seized from Nelson's billet. He observed "what appeared to him to be some of the items about which he had read." Sgt. Cook, assigned to "B" Battery of the aforementioned battalion, conducted the inventory of Jolly's property on 24 December. Thereafter Jolly's Battery Commander, Lt. Lacek, after having read a newspaper account of the Macek incident, personally viewed on 27 December the items seized from Jolly's billet. He said, "I compared certain items of jewelry in that property with what I had read in the paper." Thereafter both Lt. Wood and Lt. Lacek conferred with higher military authorities for instructions. Civilian authorities were contacted. On 27 December Fayetteville Police Detective Nash, after talking by telephone to both Lt. Wood and Lt. Lacek, told them to keep the property of Jolly and Nelson secure.

On 30 December military personnel in charge delivered the items (except for one item) taken from the billets of Jolly and Nelson to Detective Pearson of the Fayetteville Police. The one item not then delivered, an heirloom pendant taken from Mrs. Macek, was ultimately surrendered to Detective Pronier by Lt. Wood on 3 January 1978. The items—sapphire ring, wedding band, engagement ring, pendant, high school class ring, wedding band, and watch—were all identified at trial by Mr. or Mrs. Macek as having been taken from them on 16 December. Sgt. Cromartie testified that he recognized the pendant and the watch

3. Lt. Wood's later promotion to Captain is reflected at the trial of this case. Although the record is not entirely clear, we believe it supports the fact that Lt. Wood and Lt. Lacek were Battery Commanders, respectively, of "C" and "B" Batteries.

as being among the items which he removed from Nelson's military locker on 24 December. Captain Wood testified that he recognized the pendant and watch as being among the items which he examined together with Sgt. Cromartie on 27 December. Sgt. Cook testified that he recognized the sapphire ring as being among the items he found in Jolly's locker on 24 December. Detective Pearson testified that on 30 December he observed Sgt. Cook deliver all of the jewelry referred to except the watch and the pendant to Sgt. Brunner. He observed Lt. Wood deliver the watch to Sgt. Brunner. Ultimately Pearson obtained possession of everything but the pendant on 30 December. Pearson said that he observed the pendant "in Nelson's property on the 30th but he did not then take it." Detective Pronier testified that he obtained the pendant on 3 January from Lt. Wood.

Prior to trial Judge Maurice Braswell conducted a hearing on defendants' motions to suppress these items on the ground that they were unconstitutionally taken from defendants' military billets. Evidence offered at this hearing does not appear in the record, but Judge Braswell made findings of fact which essentially accord with the above recitation. He denied the motion and the items were ultimately offered in evidence as described.

Defendants, relying on Fourth Amendment proscriptions, assign as error the denial of their motion to suppress and the introduction into evidence of the jewelry. We find no merit in this assignment.

A

[1] The search by military authorities of a military billet of a soldier detained by civilian authority, or otherwise absent without leave, to make inventory of his belongings and to secure them for safeguarding pursuant to military regulation without any investigative purpose is not an *unreasonable* search or seizure proscribed by the Fourth Amendment. Both actions may be consummated without a warrant. This kind of search and seizure is analogous to that permitted of impounded automobiles by police in *South Dakota v. Opperman*, 428 U.S. 364 (1976). The Court there approved a police inventory and seizure of belongings in an impounded automobile without a warrant. Police found marijuana during their inventory of the contents of defendant's car. Defendant, later charged with criminal possession of this mari-

juana, moved to suppress evidence of his crime on the ground that it was obtained in violation of the Fourth Amendment. The United States Supreme Court, disagreeing with the Supreme Court of South Dakota, held that the trial court properly denied this motion. It concluded that "the conduct of the police was not 'unreasonable' under the Fourth Amendment." *Id.* at 376. The Court's opinion observed that (1) persons have a diminished expectation of privacy in automobiles, (2) inventories of impounded cars are routinely conducted pursuant to standardized police procedures without any investigative purpose, and (3) the inventories serve both to protect police against hazardous materials and civil claims for property loss and to protect the public against loss of their property.

This Court recently had occasion to discuss and distinguish *Opperman* in *State v. Phifer*, 297 N.C. 216, 254 S.E. 2d 586 (1979). We noted that *Opperman* stood essentially for the proposition that "the benefits in safety and protection of private property provided by a standardized police inventory outweigh the intrusion upon the diminished privacy interests of an owner whose automobile has been *lawfully* impounded." *Id.* at 220, 254 S.E. 2d at 588. Justice Huskins, for this Court in *Phifer*, wrote, *id.* at 220-21, 254 S.E. 2d at 588:

> "Since an inventory search may be undertaken without a warrent or probable cause, it is potentially subject to abuse by police officers intent upon ferreting out evidence of criminal activity. Cognizant of this danger, the Court in *Opperman* made it clear that the validity of an inventory search under the Fourth Amendment is premised upon its being a benign, neutral, administrative procedure designed primarily to safeguard the contents of lawfully impounded automobiles until owners are able to reclaim them. Accordingly, the Court stressed that inventory searches should be 'carried out in accordance with *standard procedures* in the local police department, a factor tending to insure that the intrusion would be limited in scope to the extent necessary to carry out the caretaking function.' 428 U.S. at 375, 96 S.Ct. at 3100. (Citations omitted.) The Court also pointed out that standardized inventory procedures could not be utilized as a 'pretext concealing an investigatory motive.' *Id.* at 376, 96 S.Ct. at 3092. Finally, while generally approving the reasonableness

of standardized inventory searches, the Court noted that the reasonableness of any given inventory search depended upon the circumstances presented by each case. *Id.* at 372-73, 96 S.Ct. 3092."

We concluded in *Phifer* that the search could not be justified as a "valid inventory search" because the officers "did not comply with pertinent portions of standard procedures in effect at the time of defendant's arrest for the towing, inventory, storage and release of impounded vehicles. *See* City of Charlotte Code §§ 20-20 through 24 (superseded 24 July 1978)." *Id.* at 221, 254 S.E. 2d at 588.

This case differs from *Opperman* and *Phifer* in that here we deal not with an automobile but with soldiers' billets. Solution here, however, does not depend on the proposition that a soldier has the same "diminished" expectation in his quarters as does a motorist in his car. Whatever a soldier's expectation of privacy in his quarters may be, it is not absolute and must yield to "those intrusions which are reasonably related to a legitimate governmental interest in those quarters." *United States v. Hines,* 5 M.J. 916, 919 (A.C.M.R. 1978). Inventories under certain circumstances of these quarters are justified by the need for safeguarding property owned by or within the control or custody of the government, protecting the government against claims on disputes arising from loss or theft of the property, and protecting against the hazards of storing dangerous materials. *Id.* Such inventory "searches" have been regularly upheld. *See, e.g., United States v. Welch,* 19 C.M.A. 134, 41 C.M.R. 134 (1969); *United States v. Kazmierczak,* 16 C.M.A. 594, 37 C.M.R. 214 (1967).

Judge Braswell found as a fact after hearing evidence on defendants' motion to suppress that the inventories of defendants' belongings conducted on 24 December were: (1) pursuant to military regulation (referring to those sections of Field Manual 27-1, set out at n. 2, *supra*); (2) for the purpose of securing defendants' property for the protection of both the Army and defendants; and (3) routine without any subterfuge, ulterior motive, or investigative purpose. The 24 December warrantless intrusions of defendants' billets and the securing of defendants' property found therein were, consequently, constitutionally permissible.

The 27 December examinations of defendants' property, however, were not neutral of investigatory purpose. Both officers

who then examined the property did so only after reading newspaper coverage of the Macek incident. We recognize that an initial permissible intrusion into a constitutionally protected zone does not *per se* validate a subsequent intrusion.[4]

Here, however, whatever expectations of privacy defendants might legitimately have had in their inventoried and stored belongings on 27 December, Lt. Wood's and Lt. Lacek's examination of the belongings on that date did not constitute a *second* intrusion, search, or seizure. These examinations were merely a second look at items already discovered. Sgt. Cromartie testified at trial that he recognized the pendant and the watch from having seen these items in his 24 December inventory. Likewise Sgt. Cook recognized the sapphire ring as being among the items he found in Jolly's locker on 24 December. Defendants' property, moreover, had been carefully inventoried and each item separately listed on 24 December. Lt. Gorwitz testified that on 24 December, "We then took everything that was in [Nelson's] locker out and wrote down everything that we took out on a piece of paper." Sgt. Cook testified that on 24 December he "inventoried the property" in Jolly's locker and that "after inventoring the property in the locker, I put it in a duffle bag and secured the room with a lock." Thus the 27 December inspections were for the purpose not of discovering anything new but for looking again at items already discovered and inventoried.

The cases generally hold that these kinds of "second looks" at items already once seen are not another search subject to Fourth Amendment proscriptions. In *United States v. Grill,* 484 F. 2d 990 (5th Cir. 1973), *cert. denied,* 416 U.S. 989 (1974) an arrestee's personal effects were inventoried, among them a key. The Court held that it was constitutionally permissible for officers to return for a "second look" at the key, without a warrant, when a federal agent brought a lock to the jail to see if the key would fit. Several courts have held that serial numbers on currency lawfully inventoried could be later examined by police without

---

4. *See, e.g., Mincey v. Arizona,* 437 U.S. 385 (1978) (initial entry by police to arrest suspect does not legitimize a subsequent warrantless search of apartment on the ground that the initial entry was so great an intrusion as to make the later search constitutionally irrelevant); *Michigan v. Tyler,* 436 U.S. 499 (1978) (warrantless investigatory entries into burned building were constitutionally impermissible when made days after the fire and detached from the exigency of the first entries). In *Brett v. United States,* 412 F. 2d 401 (5th Cir. 1968) an arrestee was searched and his clothing and effects were stored by police. Three days later, without a warrant, police searched his personal effects more thoroughly and found traces of heroin. Held, subsequent search violated Fourth Amendment.

a warrant. *United States v. Lacey,* 530 F. 2d 821 (8th Cir. 1976), *cert. denied,* 429 U.S. 845; *United States v. Jenkins,* 496 F. 2d 57 (2nd Cir. 1974), *cert. denied,* 420 U.S. 925 (1975) (police officers "simply looked again at what they had already-lawfully-seen."); *Westover v. United States,* 394 F. 2d 164 (9th Cir. 1968). In *People v. Rivard,* 59 Mich. App. 530, 230 N.W. 2d 6 (1975), an officer noticed a ring during an inventory of arrestee's personal property. Learning the next day that the ring probably matched a description on a list of stolen property, the officer went back for a "second look." The Court held that no warrant was required, saying, "a search warrant to again look at a ring, already in police custody, does not make sense." Finally, the Supreme Court in *United States v. Edwards,* 415 U.S. 800 (1974), held permissible a warrantless laboratory examination of a suspect's clothing seized from him on the day after the administrative mechanics of arrest and incarceration had been completed saying, "it is difficult to perceive what is unreasonable about the police examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as a result of a lawful arrest." *Id.* at 806.

The statements in *Rivard* and *Edwards* may be rendered too broadly in view of *United States v. Chadwick,* 433 U.S. 1 (1977). There officers lawfully seized a footlocker incident to the arrest of its owners. Having probable cause to believe that the footlocker contained contraband, they searched it without a warrant and discovered marijuana. The Supreme Court held the Fourth Amendment required a search warrant to open the trunk saying, "[t]here being no exigency, it was unreasonable for the Government to conduct this search [of the footlocker] without the safeguards a judicial warrant provides." *Id.* at 11.

In both *Rivard* and *Edwards,* however, the second, warrantless examination was of items already once legitimately seen. So it is here regarding the 27 December examination. It is this feature which distinguishes these cases from *Chadwick.* We find, therefore, no Fourth Amendment infirmity in the 27 December examination of defendants' belongings.

### B

[2] Defendants contend finally that surrender of this evidence by military to civilian authorities violated the Posse Comitatus Act,

18 U.S.C. 1385[5] and that the evidence should, therefore, have been excluded. A short answer to this contention is that a violation of the Act would not call for invocation of the exclusionary rule. *United States v. Walden,* 490 F. 2d 372 (4th Cir. 1974), *cert. denied,* 416 U.S. 983; *State v. Danco,* 219 Kan. 490, 548 P. 2d 819 (1976); *Commonwealth v. Shadron,* 370 A. 2d 697 (Pa. 1977).

We find, however, no violation of the Act by military authorities in this case. The legislative purpose of the Posse Comitatus Act is to preclude the direct active use of federal troops in aid of execution of civilian laws. *Gillars v. United States,* 182 F. 2d 962 (D.C. Cir. 1950); *United States v. Red Feather,* 392 F. Supp. 916 (D.S.D. 1975). Passive activities of military authorities which incidentally aid civilian law enforcement are not precluded. *United States v. Red Feather, supra.* "[T]he statute is limited to deliberate use of armed force for the primary purpose of executing civilian laws more effectively than possible through civilian law enforcement channels, and . . . those situations where an act performed primarily for the purpose of insuring the accomplishment of the mission of the armed forces incidentally enhances the enforcement of civilian law do not violate the statute." Furman, Restrictions Upon Use of the Army Imposed by the Posse Comitatus Act, 7 Mil. L. Rev. 85, 128 (1960).

Here the military authorities' surrender of evidence to civilian authorities for use in a civilian criminal prosecution of soldiers is only a passive involvement in the enforcement of civilian law. The military inventory which led ultimately to the surrender of evidence was initially conducted for military purposes. Only incidentally did it enhance the effectiveness of civilian law enforcement.

Defendants' assignments of error directed to the introduction of items discovered in the inventory of their military billets are, consequently, overruled.

## II

Both defendants assign error to the consolidation of their trials and the denial of repeated motions for severance. They

---

5. This section reads: *"Use of Army and Air Force as posse comitatus.*

Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both."

argue that consolidation should not have been permitted because (a) their defenses were antagonistic and (b) evidence admissible against only one defendant was allowed to be considered against both. Defendant Jolly argues, further, that consolidation permitted his former attorney, Mr. Williams, assistant public defender, now representing Nelson, to cross-examine Jolly on behalf of Nelson's defense. We have carefully considered these arguments and find no error in the consolidation.

One of the statutory bases for joining two or more defendants for trial is that each defendant is sought to be held accountable for the same crime or crimes. G.S. 15A-926(b)(2)a. In such cases public policy strongly compels consolidation as the rule rather than the exception. As said in *Parker v. United States*, 404 F. 2d 1193, 1196 (9th Cir. 1968), *cert. denied,* 394 U.S. 1004 (1969), consolidation

"expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once."

Joinder of defendants should not be permitted, however, if severance is necessary for "a fair determination of . . . guilt . . . ." G.S. 15A-927(c)(2)a and b. *See also* ABA Standards Relating to Joinder and Severance, § 2.3 (Approved Draft, 1968). The propriety of joinder depends upon the circumstances of each case. Absent a showing that a defendant has been deprived of a fair trial by joinder, the trial judge's discretionary ruling on the question will not be disturbed. *State v. Brower*, 289 N.C. 644, 224 S.E. 2d 551 (1976); *see also State v. Slade*, 291 N.C. 275, 229 S.E. 2d 921 (1976); *State v. Jones*, 280 N.C. 322, 185 S.E. 2d 858 (1972).

A

[3] Defendants argue that certain inconsistencies in their respective testimony amounted to "antagonistic defenses" requiring that they be given separate trials. They point to Jolly's testimony that he loaned his car to Nelson on 16 December and that certain items of jewelry found in his locker were sold to him by Nelson sometime after that date, and to Nelson's testimony denying the

truth of these statements by Jolly. Defendants rely upon *State v. Madden,* 292 N.C. 114, 121, 232 S.E. 2d 556, 661 (1977), in which this Court approved joinder where neither defendant "attempted to incriminate the other" and their defenses were not "antagonistic." *Madden,* however, does not mean that antagonistic defenses necessarily warrant severance. The test is whether the conflict in defendants' respective positions at trial is of such a nature that, considering all of the other evidence in the case, defendants were denied a fair trial. G.S. 15A-927(c)(2). In a case where antagonistic defenses were urged as a ground for severance this Court said long ago, "Unless the accused suffered some apparent and palpable injustice in the trial below, this court will not interfere with the decision of the court on the motion for a severance." *State v. Finley,* 118 N.C. 1162, 1163, 24 S.E. 495, 496 (1896).

[4] Prejudice would ordinarily result where codefendants' defenses are so irreconcilable that "the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Rhone v. United States,* 365 F. 2d 980, 981 (D.C. Cir. 1966). Severance should ordinarily be granted where defenses are so discrepant as to pose an evidentiary contest more between defendants themselves than between the state and the defendants. *See* ABA Standards Relating to Joinder and Severance 41 (Approved Draft 1968). To be avoided is the spectacle where the state simply stands by and witnesses "a combat in which the defendants [attempt] to destroy each other." *People v. Braune,* 363 Ill. 551, 557, 2 N.E. 2d 839, 842 (1936). Many cases illustrative of varying results but generally supporting these principles are collected in Annotation, "Antagonistic Defenses as Ground for Separate Trials of Co-Defendants in a Criminal Case," 82 A.L.R. 3d 245 (1978).

In *Cain v. State,* 235 Ga. 128, 218 S.E. 2d 856 (1975), defendant's testimony that he had never been at the scene of the crime was directly contradicted by his codefendants' story that they had waited in a car while defendant shot and robbed a motel owner. The Georgia Supreme Court found no error in denial of defendant's motion for severance. Although previous Georgia cases had approved joinder on the basis that codefendants' testimony was not "contradictory," *Cain* made it clear that those cases

"should not be read to mean, as Cain suggests, that if the codefendant's testimony *is* contradictory a severance should be granted. Instead the focus is properly on whether or not the defendant is prejudiced. Since Cain had a chance to cross-examine the codefendant, he was not unfairly prejudiced by the contradictory testimony." 235 Ga. at 130-131, 218 S.E. 2d at 858. (Emphasis original.)

Where other evidence in the case substantially supported the jury's finding of defendants' guilt, the Louisiana Supreme Court held that antagonistic defenses did not result in prejudice; therefore it was not error to deny a motion for severance. *State v. McGraw*, 366 So. 2d 1278 (La. 1978). In *State v. Lee*, 28 N.C. App. 156, 220 S.E. 2d 164 (1975), defendants were jointly tried on charges of armed robbery and kidnapping. Defendant Lee did not testify. Defendant Woodall testified that he was coerced into participating in the crimes by defendant Lee's threats. While noting that Woodall's testimony was antagonistic to Lee's plea of not guilty "[t]hat fact standing alone . . . is not sufficient to require separate trials. All of the competent evidence introduced at the joint trial would have been competent against Lee at a separate trial." 28 N.C. App. at 159, 220 S.E. 2d at 166.

[5]   We conclude that defendants here were not denied a fair trial by the joinder notwithstanding the conflicts in their testimony. This is not a case where the state simply stood by and relied on the testimony of the respective defendants to convict them. The state itself offered plenary evidence of both defendants' guilt. Neither defendant testified directly to the other's guilt. Both denied any participation in the crime. Each defendant was subject to cross-examination by the other. Had separate trials been granted, Jolly could have testified to the same matters tending to implicate Nelson at Nelson's separate trial. The conflict between each defendant's respective testimony was not of such magnitude when considered in the context of other evidence that the jury was likely to infer from that conflict alone that both were guilty.

B

[6]   Defendants next argue that joinder permitted evidence competent against only one defendant to be considered against the other. This consequence of joinder, they say, was aggravated

because the trial judge in reviewing the evidence against Nelson alluded to items of stolen jewelry which the state's evidence tended to show was found in Jolly's locker.

That the jury might have considered evidence competent only against one defendant as evidence against the other is a consequence defendants might have avoided had they made timely objections and motions for limiting instructions. "Where testimony incompetent as to one defendant is admitted without objection and without request that its admission be limited, an exception thereto will not be sustained." *State v. Case*, 253 N.C. 130, 137, 116 S.E. 2d 429, 434 (1960), *cert. denied*, 365 U.S. 830 (1961). *See also State v. Pierce*, 36 N.C. App. 770, 245 S.E. 2d 195 (1978); *State v. Kessack*, 32 N.C. App. 536, 232 S.E. 2d 859 (1977). In *Pierce* different items of stolen property were shown to have been in the possession of each defendant after a breaking and entering. No limiting instructions were given. The Court of Appeals said that defendants

> "may not now be heard to complain because evidence showing the separate possession of each was admitted generally against both without instructions to the jury to make it clear as against which defendant the evidence might be considered. Prejudice, if any, suffered by the defendants resulted, not because the cases were consolidated for trial, but because defendants' counsel failed to request limiting instructions or to interpose timely general objections requiring them." 36 N.C. App. at 772, 245 S.E. 2d at 198.

This Court has held that even a general objection by a codefendant against whom evidence is inadmissible will suffice to require the trial judge to give limiting instructions. *State v. Franklin*, 248 N.C. 695, 104 S.E. 2d 837 (1958). The record here, however, is devoid of any general objection, much less a request for limiting instructions, by either defendant as to testimony regarding items obtained from their respective lockers. That the evidence might have been generally considered is, therefore, no error. *State v. Smith*, 291 N.C. 505, 231 S.E. 2d 663 (1977); *State v. Gosnell*, 38 N.C. App. 679, 248 S.E. 2d 756 (1978).

Neither did either defendant object to the trial court's recapitulation of the state's evidence. Generally, objections to misstatements of evidence must be made before the jury retires

in order to give the trial judge an opportunity to make correction. *State v. Hewett,* 295 N.C. 640, 247 S.E. 2d 886 (1978). "It is only where the judge erroneously instructs the jury on a *material fact not in evidence* that the error will be held so prejudicial as to require a new trial notwithstanding defense counsel's failure to make timely objection." *State v. Smith,* 294 N.C. 365, 379, 241 S.E. 2d 674, 683 (1978).

C

Jolly argues that the joint trial permitted his former attorney, Mr. Williams, who represented Nelson at trial, to cross-examine Jolly and argue Jolly's exclusive guilt to the jury on behalf of Nelson. Jolly contends that Mr. Williams actually "prosecuted" him and that to permit such "prosecution" by his former attorney denied him a fair trial.

Mr. Williams, Nelson's trial counsel, had originally represented both Nelson and Jolly as an assistant public defender. On 5 January 1978 the court, after finding that an apparent conflict between the defendants precluded Williams from representing both defendants, appointed Mr. Fleishman as counsel for Jolly. At trial Mr. Williams' cross-examination of Jolly was directed at discrediting Jolly's testimony. Mr. Williams argued to the jury on behalf of defendant Nelson that the evidence tended to show that Jolly and not Nelson was guilty. The record is devoid of any suggestion that Mr. Williams obtained information by way of confidential communications from Jolly during their attorney-client relationship, used such information, or in any way relied on his former representation of Jolly to Jolly's disadvantage at the trial.

Since the cornerstone of Jolly's argument is that it was unfair to his interest[6] for his former attorney to cross-examine him and argue his guilt to the jury, a short answer is that Jolly made no timely opposition to either the cross-examination or the jury

---

6. Jolly does not argue that his Sixth Amendment right to counsel has been abridged. *Cf., Holloway v. Arkansas,* 435 U.S. 475 (1978) (denial of separate representation to multiple defendants with conflicting interests is a *per se* deprivation of adequate counsel). Such an argument, had it been supported in the record, could have been made by Nelson on the theory that Nelson's counsel, Mr. Williams, was inhibited in his attempts to discredit Jolly's damaging testimony because of his allegiance to his former client. "[T]he evil . . . is in what the advocate finds himself compelled to *refrain* from doing. . . ." *Id.* at 490. *See, e.g., People v. Baxtrom,* 61 Ill. App. 3d 546, 378 N.E. 2d 182 (1978) (Illinois' rule that prejudice will be presumed where record shows defense counsel involved in actual or potential conflict of interest because of duty to former client). Here, however, Jolly argues that the conduct of Nelson's attorney prejudiced *Jolly.*

arguments. Jolly never moved to have Mr. Williams disqualified or removed from the case. Jolly could have properly objected to Williams' questions had they invaded areas covered by the attorney-client privilege. *See, e.g., State v. Hamrick*, 26 N.C. App. 518, 216 S.E. 2d 391 (1975), *cert. denied*, 288 N.C. 246, 217 S.E. 2d 670 (proper to bar cross-examination of a witness as to matters covered by the privilege). Having neither objected nor moved to strike the cross-examination at trial, Jolly cannot directly assign error to the cross-examination on appeal. *State v. Foddrell*, 291 N.C. 546, 231 S.E. 2d 618 (1977). Similarly Jolly's failure to object to Mr. Williams' jury argument in time for corrective action by the trial court precludes his right to complain of it on appeal. Absent gross impropriety in a jury argument, objection to it must be made at trial in order to preserve the error for consideration on appeal. *State v. Smith, supra*, 294 N.C. 365, 241 S.E. 2d 674.

[7] As we understand it, however, Jolly's argument does not attack Mr. Williams' cross-examination or jury argument as such. Jolly urges us instead to hold that prejudice warranting a new trial automatically results to a defendant whose opposing codefendant is represented by counsel who formerly represented both defendants. In effect, Jolly proposes that considerations of ethics and public policy require us (1) to adopt a *per se* rule compelling counsel to withdraw completely from any case wherein a conflict develops between his multiple clients, and (2) to enforce that rule by awarding a new trial if counsel fails to withdraw even in absence of a proper trial motion or showing of actual prejudice. Reason and authority persuade us to reject this proposition.

Not before us is whether Mr. Williams should have voluntarily sought to withdraw from the case[7] or whether, on Jolly's mo-

---

7. Certain ethics opinions issued by the Council of the North Carolina State Bar suggest that voluntary withdrawal under the circumstances in which Mr. Williams found himself is the proper course in order for an attorney to avoid even the "appearance of impropriety." *See, e.g.,* CPR 195, 19 October 1978 (attorney may not assist in the murder prosecution of one who had previously consulted him about the domestic difficulties which allegedly culminated in murder); CPR 160, 14 April 1978 (attorney should not accept employment in a matter in which a former client will be an adverse party or witness); CPR 155, 27 October 1977 (a public defender may not represent X in a case in which present or former client Y may be a witness for the state); Ethical Opinion No. 548, 13 January 1967 (when attorney in a criminal case discovers that defenses of his several clients may be inconsistent, he should retire completely from the case).

Lawyers' ethics, however, govern the conduct of advocates, not the advocates' forum. While it should be the policy of courts to give them effect, they do not *per se* shape the contours of due process. *See Town of Mebane v. Insurance Co.*, 28 N.C. App. 27, 30, 220 S.E. 2d 623, 625 (1975).

tion, he should have been required to withdraw.[8] The question here presented is whether Mr. Williams' continued representation of Nelson in face of testimonial conflicts between Nelson and Jolly entitles Jolly to a new trial. The answer is no unless Jolly can show actual prejudice accruing from this circumstance. Actual prejudice in this context means more than a defendant's having been damaged at trial by actions of his former lawyer. The actions complained of must have grown out of the former attorney-client relation. The record should show that the attorney took advantage of the former relation in some way at the subsequent trial or that the former relation put the attorney in a better position to inflict the damage than he otherwise would have been. *See generally, United States v. Carroll*, 510 F. 2d 507 (2d Cir. 1975), *cert. denied*, 426 U.S. 923; *United States v. Press*, 336 F. 2d 1003 (2d Cir. 1964), *cert. denied*, 379 U.S. 965 (1965); *People v. Suiter*, 82 Mich. App. 214, 266 N.W. 2d 762 (1978). That there was a former attorney-client relation is not, alone, enough.

[8]   Here Jolly has failed to show prejudice arising from having his former lawyer represent his codefendant Nelson at trial. The questions asked Jolly on cross-examination by Mr. Williams and Mr. Williams' argument to the jury carry not the slightest suggestion that they were engendered by information obtained during Mr. Williams' representation of Jolly or that this representation put Jolly at any other disadvantage at his trial. Further defendant's acquiescence in the adverse representation of his former lawyer weighs heavily against him on appeal. *United States v. Press, supra; People v. Suiter, supra.* Defendant should make known his objections to the adverse representation of a former lawyer at trial not only to avoid acquiescing in it but also to establish a foundation for his contention of prejudice in the context of a properly conducted *voir dire.* Jolly's assignment of error based on his former representation by Williams is, therefore, overruled.

---

8. The cases are divided as to whether movant need show upon proper motion (1) that the attorney did in fact use confidences against him, or (2) that the attorney gained confidences which could have been used, or (3) that a prior attorney-client relationship simply existed. *Compare Woods v. Covington County Bank*, 537 F. 2d 804, 813 (5th Cir. 1976) ("we conclude that there must be at least a reasonable probability that some specifically identifiable impropriety did in fact occur."); *State v. Brown*, 274 So. 2d 381 (La. 1973) (district attorney need not be recused merely because of prior involvement or assistance in the defense, absent demonstration that the district attorney gained or used confidential information); *State v. Miner*, 128 Vt. 55, 258 A. 2d 815 (1969) (disqualification not necessary absent showing of violation of confidence); *United States v. Trafficante*, 328 F. 2d 117 (5th Cir. 1974) (need not show acquisition of confidential knowledge in order to disqualify opposing counsel because of former employment); *State ex rel. Moran v. Ziegler*, 244 S.E. 2d 550 (W. Va. 1978) (even the appearance of a conflict of interest will be grounds for disqualification of a prosecuting attorney upon proper motion).

## III

[9] Both defendants assign error to the denial of their motions for mistrial made after the trial court excused a juror and substituted an alternate. Before the lunch break on Friday, 29 September 1978, it became obvious that the case could not be concluded by the day's end. The court had already decided not to hold sessions on the next Monday or Tuesday, October 2-3, in deference to Jolly's attorney's request to be excused for Jewish religious holidays. In view of the long break ahead, the trial court asked members of the jury whether they could appear on Saturday. All but Mrs. Henson, Juror No. 11, indicated that they could. The judge excused Mrs. Henson at 4:25 p.m. on 29 September and substituted the alternate juror.

Defendants' contention that the excusal constituted prejudicial error requiring a mistrial is without merit. The trial judge has broad discretion in supervising the selection of the jury to the end that both the state and defendant may receive a fair trial. *State v. McKenna*, 289 N.C. 668, 224 S.E. 2d 537, *death sentence vacated*, 429 U.S. 912 (1976). This discretionary power to regulate the composition of the jury continues beyond empanelment. *State v. Kirkman*, 293 N.C. 447, 238 S.E. 2d 456 (1977). It is within the trial court's discretion to excuse a juror and substitute an alternate at any time before final submission of the case to the jury panel. G.S. 15A-1215. These kinds of decisions relating to the competency and service of jurors are not reviewable on appeal absent a showing of abuse of discretion, or some imputed legal error. *State v. Waddell*, 289 N.C. 19, 220 S.E. 2d 293 (1975), *death sentence vacated*, 428 U.S. 904; *State v. McNair*, 36 N.C. App. 196, 243 S.E. 2d 805 (1978).

Here no prejudice, abuse of discretion, or legal error has been shown to result from the excusal of Mrs. Henson. The alternate substituted in her place in accordance with G.S. 15A-1215 had been subject to a challenge, peremptory or for cause, by defendants, G.S. 15A-1217. The alternate was empaneled with the other jurors and heard all the evidence. A defendant "is not entitled to a jury of his choice and has no vested right to any particular juror. So long as the jurors who are actually empaneled are competent and qualified to serve, defendant may not complain . . . ." *State v. McKenna, supra*, 289 N.C. at 681, 224 S.E. 2d at 546.

In a related argument Jolly assigns error to the denial of his motion for continuance. Jolly's attorney, Mr. Fleishman, moved for continuance prior to trial on the grounds that it would be impossible to complete trial during the week of 25 September and he would not be present the next Monday or Tuesday because of religious holidays. Jolly now argues in his brief that denial of this motion was an abuse of the trial court's discretion "insofar as this issue relates to [substituting the alternate juror]." Presumably "this issue" refers to the fact that the parties were aware in advance that the trial would last longer than a week and that there would be a long break due to Mr. Fleishman's absence for two days of the second week. In any case, we fail to see how Jolly was prejudiced by denial of the continuance. The prospect of a lengthy break in a lengthy trial was occasioned by Jolly's own attorney's desire, however commendable, to put in an appearance before an authority higher than the secular bench. Jolly should not now be heard to complain of a delay brought about by his own counsel. This assignment is overruled.

IV

[10] Both defendants assign error to the admission in evidence of a black holster and a box of .22 bullets which had been discovered in Jolly's car at the time of defendants' arrest on 22 December. Jolly's contentions that the police searches of his automobile were illegal are without merit, having been previously passed upon adversely to him in *State v. Jolly, supra,* n. 1, 297 N.C. 121, 254 S.E. 2d 1. The only remaining question is whether this evidence was so irrelevant and prejudicial as to make its admission reversible error.

The "test" of relevance is whether an item of evidence tends to shed any light on the inquiry or has as its only effect the exciting of prejudice or sympathy. *See State v. Brown,* 294 N.C. 446, 242 S.E. 2d 769 (1978), and cases cited therein. In the present case, testimony of the Maceks tended to show that their assailants had been armed with a "short golden type or silver pistol" on 16 December. The state contends that the presence of a holster and small caliber ammunition in Jolly's car on 22 December is "of some relevance" in that it shows Jolly probably carried a pistol at one time. It is arguable that the challenged evidence may have some probative value in tending to establish

Jolly's possession of a small gun at *some* time prior to 22 December. "[I]n a criminal case, any evidence which sheds light upon the supposed crime is admissible." *State v. Bundridge*, 294 N.C. 45, 58, 239 S.E. 2d 811 (1978), *citing State v. Hamilton*, 264 N.C. 277, 141 S.E. 2d 506 (1965), *cert. denied*, 384 U.S. 1020 (1966). "[T]he evidence need not bear directly on the issue and . . . the inference to be drawn need not be a *necessary* one." 1 Stansbury's North Carolina Evidence § 78 (Brandis rev. 1973); *see generally id.* §§ 77, 78, and cases cited therein. In *Bundridge* the trial court in a prosecution for assault and armed robbery allowed in evidence bloodstained clothing seized at defendant's residence *on the night of the crime*, though there was no showing that defendant had worn the clothing at the time in question or that the stains were of the victim's blood. Our Court held the evidence admissible, finding a reasonable connection between the clothing and the crime.

Here, however, the link between holster and ammunition seized from Jolly's car on 22 December and the possession of a gun by the Maceks' assailants some six days earlier is more attenuated than the circumstantial connection in *Bundridge*. Yet even if the evidence here was technically incompetent, defendants have not demonstrated prejudice by its admission. An examination of the entire record reveals that evidence of the holster and bullets constituted an insignificant part of the state's case. The items were used by the state only once at trial and were not mentioned in the judge's review of the evidence. In light of other considerable evidence against defendants, there is no reasonable basis to believe the jury would have returned a different verdict had this particular evidence been excluded. Its admission, if error, was therefore harmless. G.S. 15A-1443; *State v. Hudson*, 281 N.C. 100, 187 S.E. 2d 756 (1972), *cert. denied*, 414 U.S. 1160.

V

[11] In their various assignments of error to the trial court's jury instructions, defendants first contend that the instruction defining constructive breaking had no application to the facts of this case.

The court instructed the jury that a "breaking" may be shown where the defendant, by threat or force, inspires such fear as to induce the occupants to allow him to enter. This definition is

in accord with those previously approved by this Court. A "breaking" in the law of burglary constitutes any act of force, however slight, employed to effect an entrance; a constructive breaking occurs where entrance is obtained as a consequence of violence commenced or threatened by defendant. *See State v. Jolly,* supra, 297 N.C. 121, 254 S.E. 2d 1; *State v. Wilson,* 289 N.C. 531, 223 S.E. 2d 311 (1976); *State v. Rodgers,* 216 N.C. 572, 5 S.E. 2d 831 (1939). The evidence here tends to show that one of the defendants pointed a gun at Mr. Macek as he was standing at the door of his motel room. When Mrs. Macek opened the door she saw the gun pointed at her husband's head. Mr. Macek was then "kind of shoved" into the room. Neither defendant was given permission to enter the room. The instructions on constructive breaking were appropriately applied to these facts.

[12]   Both defendants next complain that the trial court erred in refusing to submit tendered instructions on lesser included offenses. Jolly contends the court should have instructed on the lesser offense of felonious breaking or entering. Nelson maintains the court should have charged with respect to second degree burglary. Neither proposition is correct. A jury should be instructed on a lesser included offense *only* when there is evidence tending to show that such lesser crime was committed. *State v. Fleming,* 296 N.C. 559, 251 S.E. 2d 430 (1979). To justify a finding of felonious breaking or entering, there must be evidence tending to show that entry was obtained otherwise than by a burglarious breaking. *State v. Jolly, supra,* 297 N.C. 121, 254 S.E. 2d 1. The evidence here plainly tends to show only a burglarious breaking. To justify a charge on second degree burglary, there must be evidence from which the jury could find that the dwelling house or sleeping apartment in question was unoccupied at the time of the breaking. *State v. Tippett,* 270 N.C. 588, 155 S.E. 2d 269 (1967). The uncontradicted testimony of Mrs. Macek was that she was in the motel room at the time the defendants gained entry. These assignments are overruled.

[13]   Jolly contends the court erred in telling the jury that the motel room was a "sleeping apartment" for purposes of applying the law of burglary. He correctly points to *State v. Wells,* 290 N.C. 485, 226 S.E. 2d 325 (1976) where a similar instruction was held to be error, albeit harmless. In *Wells,* a first degree burglary case, the trial court instructed the jury that "[t]he apartment

described for you [in the evidence] . . . is a sleeping apartment."
This Court held that such an affirmative statement constituted an
impermissible expression of opinion, or an assumption that a
material fact had been proved. *See* G.S. 15A-1232, replacing in
substance former G.S. 1-180. Here, however, as in *Wells*, such er-
ror as is shown by this part of the charge cannot have prejudiced
defendant. There can be no serious contention that a motel room,
regularly and usually occupied by travelers for the purpose of
sleeping, is not in fact a "sleeping apartment" within the meaning
of G.S. 14-51 and its predecessors. *See State v. Foster*, 129 N.C.
704, 40 S.E. 209 (1901). Nor did defendants contest the "sleeping
apartment" issue at trial, other than by their general pleas of not
guilty. Since there is no reasonable possibility that this error con-
tributed to Jolly's conviction or that a different result would have
obtained had the language complained of been omitted, the error
is harmless. G.S. 15A-1443; *State v. Wells, supra.* Jolly yet urges
this Court to grant a new trial as a means of insuring that the
trial bench will cease giving this type of erroneous instruction.
Judicial enactment of this kind of supervisory rule is unwar-
ranted. "[E]rrors relating to rights arising under the statutory
law of the State will not entitle defendant to a new trial unless he
demonstrates that the error was material and prejudicial." *State
v. Jolly, supra*, 297 N.C. at 126, 254 S.E. 2d at 5; *see* G.S. 15A-1442
and 1443(a).

## VI

[14] Officer Pronier testified at trial that the Maceks had
selected the photo of one James King from a police photograph
book. Testimony was admitted over objection concerning the of-
ficer's subsequent investigation of King. By his sixth assignment
of error, Jolly asserts that such testimony was irrelevant and
should have been excluded.

It is true, as Jolly contends in his brief, that the testimony
about King "had no tendency to prove the probability or im-
probability of any fact in issue in this case." As such, its admis-
sion cannot have harmed defendant. Even where irrelevant or
incompetent evidence is admitted, the burden remains upon ap-
pellant to show prejudice. G.S. 15A-1443(a); *State v. Hudson,
supra*, 281 N.C. 100, 187 S.E. 2d 756. No prejudice is demonstrat-
ed here. If anything, the inference raised by this evidence is
favorable, not prejudicial, to Jolly. This assignment is overruled.

## VII

[15] Jolly's seventh assignment of error relates to the trial court's denial of his motion for mistrial made after cross-examination by the state. Testifying on his own behalf, Jolly had some difficulty in recollecting whether an automotive repair shop had repaired his car on 14 or 16 December. The state showed him Exhibit No. 50, a dated receipt from the shop, to refresh his recollection. He then testified that the repairs had been made on 14 December. The receipt had previously been suppressed *as evidence* on the grounds that its seizure was the product of an unconstitutional search. Jolly's attorney objected to the use of Exhibit No. 50 for any purpose, and his motion for mistrial was denied.

Jolly's argument that the receipt was "tainted evidence" which was "used to impeach his recollection of events" is simply not supported by the record. The receipt was never admitted into evidence or shown to the jury. Where a writing is used to refresh the recollection of a witness, it is not the writing which is evidence but the testimony of the revived recollection. *State v. Smith, supra,* 291 N.C. 505, 231 S.E. 2d 663 (1977); *see generally* 1 Stansbury's North Carolina Evidence § 32 (Brandis rev. 1973). There is nothing in the record to suggest that presentation of the receipt to defendant "impeached" his credibility in the eyes of the jury. Its use was limited to aiding him to clarify an uncertainty which he had already admitted.

Even if showing the receipt to Jolly was error of constitutional dimension, which we do not decide but which the state concedes, the error was harmless. The crime was committed on the night of 16 December. Whether defendant's car was repaired 14 or 16 December was immaterial. Had the suppressed receipt been fully admitted into evidence, its presence would have added nothing to the state's case. Since the receipt contributed in no way to Jolly's conviction, we are satisfied that the state has demonstrated, as it has the burden to do, that error in its use was harmless beyond a reasonable doubt. G.S. 15A-1443(b); *see Chapman v. California,* 386 U.S. 18 (1967); *State v. Shutt,* 279 N.C. 689, 185 S.E. 2d 206 (1971), *cert. denied,* 406 U.S. 928 (1972). In the absence of a showing of prejudicial error, the trial court properly denied the motion for mistrial. G.S. 15A-1061; *State v. Chapman,* 294 N.C. 407, 241 S.E. 2d 667 (1978).

## VIII

[16]   By his third and fourth assignments of error, Nelson *seems* to argue that the pre-trial lineup at which he was identified was constitutionally defective, and that the trial court erred in allowing Mrs. Macek to identify him in court by touching him on the shoulder.

Both of the Maceks independently selected Nelson from a lineup of six black males of substantially similar height and weight and wearing identical clothing. Both of the Maceks then witnessed a second lineup, similar in procedure. Jolly but not Nelson was in the second lineup. The Maceks selected someone other than Jolly. After completion of both lineups Detective Nash told the Maceks that they picked the "right person" in the first lineup but not in the second.

A careful study of Nelson's brief reveals that although Nelson argues that his lineup was impermissibly suggestive, no attempt is made to controvert the trial court's finding that the lineup was entirely proper. Instead, Nelson submits that the detective's comment after the lineup identification procedure must be considered together with the lineup as part of "the totality of the out-of-court procedures which in any way affected the witness' in-court identification." It is contended that because of improper out-of-court suggestiveness on the part of the police detective in making the comment, Mrs. Macek should not have been permitted to make her courtroom identification of Nelson. This argument fails in at least two respects.

In the first place, defendant seeks to apply the right law to the wrong facts. It is true that where the setting for pre-trial confrontation is found to have been unnecessarily suggestive and conducive to mistaken identification, a subsequent in-court identification will be rendered inadmissible unless it is first determined (usually upon *voir dire*) that the courtroom identification is of independent origin. *State v. Henderson*, 285 N.C. 1, 203 S.E. 2d 10 (1974). The evil sought to be remedied by this exclusionary rule is the "substantial likelihood of *irreparable* misidentification," *Simmons v. United States*, 390 U.S. 377, 384 (1968). (Emphasis added.) Irreparability arises because the witness is apt to retain in his memory the image of a photograph or lineup participant rather than of the person actually seen committing the

crime. In effect, when police manipulate suggestive elements of an identification procedure to convince a witness that "there is the man," the reliability of the witness' subsequent identification of the defendant in court can be so undermined as to violate due process. *See Foster v. California*, 394 U.S. 440 at 443 (1969).

These principles of constitutional law do not apply to the facts of this case. The courtroom identification at issue here, indeed the *only* specific witness identification of either defendant in the entire record, occurred in the course of Mrs. Macek's testimony *about the pre-trial lineups.*[9]

> Mrs. Macek: "I selected number four from the first line-up. I told Detective Nash that number four was the man that I had picked out as having been in my room.
>
> Q:        All right. Do you know whether or not you see that man in court now?
>
> A:        Yes.
>
> Q:        And who is it?
>
> A:        He's sitting right there with Mr. Williams (indicating)."

Upon objection by Nelson's attorney, the trial court intervened and asked Mrs. Macek to touch the person she was identifying on the shoulder. She left the stand and touched Nelson. By doing so, she did no more than identify Nelson as the man she had picked from the first lineup. Hence we are not faced with the sort of in-court "identification" which may suffer from the dubious ancestry of pre-trial suggestiveness. Mrs. Macek's identification of Nelson as the man she chose from the lineup is merely a part of her general testimony about the lineup itself. Its admissibility stands or falls with the admissibility of other testimony regarding the lineup. Having properly found that the lineup itself was free from undue suggestiveness, the trial court did not err in permitting the challenged testimony.

---

9. Nowhere in the record do either of the prosecuting witnesses directly point out Nelson or Jolly as the men in their motel room on the night of the 16th. There is, however, ample evidence of defendants' possession of recently stolen goods, coupled with other strong circumstantial evidence tending to show defendants' guilt.

Second, assuming for the sake of argument that the identification at issue was an in-court, accusatory identification, we need not necessarily conclude that it was fatally tainted by pretrial suggestiveness. It may be questioned at the outset whether a post lineup remark that the witness picked "the right person" was suggestive at all, or merely served to confirm what the witness already knew. *Cf., United States v. Person*, 478 F. 2d 659 (D.C. Cir. 1973) (remark to witness after lineup that she had "done well" in picking defendant does not materially affect the certainty of the in-court identification); *Jackson v. State*, 361 So. 2d 1152 (Ala. Cr. App. 1977) (officer's statement after lineup identification of "that is the man we are looking for" not unduly suggestive). In any case, the remark complained of can be viewed as impermissibly suggestive only to the degree that it served to strengthen an identification which was initially tentative. The record here indicates the contrary. Mrs. Macek testified, "After Mr. Nash told us that we had picked out the wrong man [in the second lineup] I was not sure that we had picked out the right man [in the first]."

Even if Nash's comment were such as to raise an aura of suggestiveness around the totality of the pre-trial identification process, the question remains whether the suggestiveness gave rise to a substantial likelihood of misidentification at trial. *See Manson v. Brathwaite*, 432 U.S. 98 (1977); *Neil v. Biggers*, 409 U.S. 188 (1972); *State v. Headen*, 295 N.C. 437, 245 S.E. 2d 706 (1976). It is the strong probability of misidentification which violates a defendant's right to due process. Unnecessarily suggestive circumstances alone do not require the exclusion of identification evidence. The factors to be considered in evaluating the inherent reliability of the contested identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention during the commission of the crime; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the challenged confrontation; and (5) the length of time between the crime and the confrontation. *Neil v. Biggers, supra.* Against these factors must be weighed the "corrupting influence" of any suggestive circumstances leading to and surrounding the contested identification. *See Manson v. Brathwaite, supra.*

Applying these standards, we find plenary evidence of the inherent reliability of Mrs. Macek's assumed courtroom identification of Nelson. It cannot be said that she suffered from lack of attention on the night of 16 December, or that she had little opportunity to view her rapists. "She was no casual observer, but rather the victim of one of the most personally humiliating of all crimes." *Neil v. Biggers, supra,* 409 U.S. at 200. Although her eyes were shut during some moments of the sexual assaults, they were open well enough to see the man later identified from the lineup as Nelson: "I had a good view of his face as it was only a couple of inches from mine." She saw his clothes and the build of his legs. She later gave a fairly complete description of his age, height, weight, complexion, and other physical characteristics. This description matched well the characteristics exhibited by Nelson around the time of his arrest. There was no uncertainty manifested in court. Although there was a gap of over nine months between the crime and the courtroom confrontation, the negative force of this factor is lessened by the certainty of the first confrontation two weeks after the crime—a valid lineup in which the witness took "approximately one minute and three seconds" to pick out Nelson. Weighing this "totality of circumstances" against the possible suggestiveness of a single post lineup comment, it can hardly be said that Mrs. Macek's courtroom testimony was less than reliable. The ample opportunity of the victim to witness the events and actors of the night of 16 December supports a conclusion that her in-court "identification" of defendant Nelson had an origin sufficiently independent of the taint of a single improper remark.

[17] Nor can there be error in the trial court's allowing the witness to touch Nelson on the shoulder. The touching of defendant simply served to remove any possibility of doubt as to the man about whom the witness was testifying. There is nothing improper or prejudicial in the trial court's insistence on certainty. *See, e.g., State v. Cook,* 280 N.C. 642, 187 S.E. 2d 104 (1972) (no error to allow an eight-year-old rape victim to identify defendant by touching him).

IX

[18] Nelson's assignments of error 6 and 7 contest the trial court's denial of a motion to suppress State's Exhibit No. 25, a

watch which had been seized from the Cumberland County jail pursuant to a search warrant.

Nelson's brief admits that in February, 1978, the state gave Nelson's counsel notice of its intention to use the watch as evidence. For "some reason . . . which this attorney cannot explain to this Court," Nelson's Brief, p. 14, Nelson never moved prior to trial to suppress the watch as required by G.S. 15A-975. Nelson's motion to suppress at trial was denied for the reason that it was not timely.

No contention is made that Nelson did not have reasonable opportunity to submit the required motion prior to trial. Nor is there any suggestion that other circumstances existed which, under the statute, would permit a motion to suppress to be made at trial. Thus there is no error in the trial court's denial of the motion or in the failure to conduct a *voir dire* hearing. *State v. Hill*, 294 N.C. 320, 240 S.E. 2d 794 (1978). Nelson's argument that the procedure provided by G.S. 15A-975 cannot take precedence "over a constitutional right" is without merit. Far from displacing any constitutional right, the statute merely provides for their timely assertion. It is not impermissible for a state to impose reasonable conditions on the assertion of motions to suppress evidence. *See Wainwright v. Sykes*, 433 U.S. 72 (1977).

These assignments of error are overruled.

In the trial of these defendants we find

No error.

Justice CARLTON did not participate in the consideration and decision of this case.