STATE OF NORTH CAROLINA v. ALTON GARNER GREEN

No. 38A87

(Filed 9 March 1988)

**1. Criminal Law § 92.1— first degree murder—joinder of trial with that of codefendant—no denial of fair trial**

The trial court did not err in granting the State's motion for joinder and in denying defendant's motion to sever his first degree murder trial from that of his female codefendant on the ground that the codefendant's testimony was so antagonistic to defendant's plea of not guilty as to prejudice his right to a fair trial where the codefendant's testimony, while tending to show that defendant shot and killed three people, also suggested at least provocation and perhaps self-defense and supported defendant's denial that he acted with premeditation and deliberation; the State did not stand by and rely on the codefendant's testimony to prove its case but presented sufficient evidence independent of the codefendant's testimony from which a jury could conclude that defendant was guilty of first degree murder; and neither prosecutorial stratagem nor the operation of court rules impaired defendant's ability to defend himself. N.C.G.S. § 15A-926(b)(2); N.C.G.S. § 15A-927(c)(2).

**2. Criminal Law § 34.5— evidence of another crime—admissible to show identity**

In a prosecution for the first degree murder of three persons in a tavern, evidence concerning an incident in which defendant pistol-whipped one patron and shot a second patron in another tavern two weeks earlier was admissible to prove defendant's identity as the perpetrator of the murders in question where both incidents had the following similarities: a victim at each tavern was pistol-whipped; defendant jammed his gun into the ear of the man he pistol-whipped in the earlier incident, and one of the murder victims had a lacerated ear which may have been produced by the same procedure; a victim of the earlier incident and two of the murder victims were shot in the stomach at point-blank range; in both incidents the savagery of the violence toward the victims was never adequately accounted for by any legitimate or criminal motive; and in both incidents, defendant dispatched a female companion to fetch his guns and to ready the van in which he fled the scene. N.C.G.S. § 8C-1, Rule 404(b).

**3. Homicide §§ 1.6, 32.1— felony murder—sufficient evidence of armed robbery—harmless error in submission**

There was sufficient evidence of armed robbery to submit felony murder to the jury even if defendant's intent to take the victims' wallets was formed after he shot the victims. Had the evidence of armed robbery been insufficient, defendant was not prejudiced by the submission of felony murder because the jury did not find him guilty of any charge based on a felony murder theory.

**4. Criminal Law § 46.1— instruction on flight—sufficient evidence**

There was sufficient evidence in this first degree murder case to support the trial court's instruction on flight as evidence of guilt where the evidence

tended to show that immediately after the three victims were shot, defendant and his female companion went to Virginia to collect money owed to the companion and to get personal belongings; defendant told his companion's uncle in Virginia that he couldn't return to Durham to straighten out charges pending against him there because he had "killed three people"; defendant and his companion then went to Florida where defendant asked the companion's father to help him get a car that would not be registered in defendant's name; and when police entered the hotel suite where defendant was staying in Florida, he was discovered hiding in a closet with a sawed-off shotgun. Whether there was any plausibility in defendant's alternative explanation that he and his female companion had no fixed address and were merely traveling from town to town had no bearing on the propriety of an instruction on flight.

5. **Criminal Law § 135.8— first degree murder — avoiding arrest aggravating circumstance**

In this prosecution for three first degree murders committed in a tavern, the State presented sufficient evidence that one victim was killed to eliminate him as a witness to support the court's submission of the aggravating factor that such murder was committed for the purpose of avoiding or preventing a lawful arrest, N.C.G.S. § 15A-2000(e)(4), where the State's evidence tended to show that the victim was sitting at the tavern bar, alternately drinking beer and falling asleep or passing out with his head on his arms, waking, and falling asleep again; the victim was shot in the back while asleep or while immobilized with fear at the bar; such victim had not resisted the killer as had a second victim; and, unlike the third victim, such victim was not armed and could not have presented a threat to the killer.

6. **Criminal Law § 135.8— witness elimination — violent course of conduct — aggravating factors not based on same evidence**

The trial court's findings of witness elimination and violent course of conduct aggravating factors for a first degree murder were not based on the same evidence since the violent course of conduct factor directs the jury's attention to the factual circumstances of defendant's crimes while the witness elimination factor requires the jury to consider defendant's motive rather than his actions in shooting a man in defenseless posture.

7. **Criminal Law § 135.8— prior conviction aggravating circumstance — proof permitted**

In a prosecution for three first degree murders, the State was not limited to the introduction of the court record of defendant's prior armed robbery conviction in establishing the aggravating circumstance that defendant had previously been convicted of a felony involving the use or threat of violence to the person, and the trial court did not err in allowing the State to present the testimony of a former police officer who had investigated the armed robbery and who had arrested defendant for the crime.

8. **Constitutional Law § 63; Jury § 7.11— death qualified jury — constitutionality**

The trial court's exclusion for cause of certain jurors who expressed an unwillingness to impose the death penalty did not produce a jury biased in

favor of conviction and prone to find defendant guilty in violation of
defendant's constitutional rights.

**9. Criminal Law § 135.8— especially heinous aggravating circumstance — sufficient
evidence**

There was sufficient evidence to support the trial court's submission of
the "especially heinous, atrocious or cruel" aggravating circumstance in a first
degree murder case. Even if the evidence of this aggravating circumstance
was insufficient, defendant was not prejudiced as a result of its submission
because the jury found that this aggravating circumstance was not present.

**10. Constitutional Law § 80; Criminal Law § 135.4— constitutionality of death
penalty statute**

There is no merit to defendant's contention that the North Carolina death
penalty statute, N.C.G.S. § 15A-2000, is unconstitutional on grounds that it is
applied in a discriminatory manner, is vague and overbroad, and involves sub-
jective discretion. Eighth and Fourteenth Amendments to the U. S. Constitu-
tion; Art. I, §§ 19 and 27 of the N. C. Constitution.

**11. Criminal Law § 135.10— death sentences not disproportionate**

Sentences of death imposed on defendant for three first degree murders
committed with premeditation and deliberation are not disproportionate to the
punishment imposed in similar cases considering the crimes and the defendant
where three men were shot, one was beaten, and all were then dispatched, ex-
ecution style, by multiple close-range shots to the head, and there was no
evidence of any motive of the sort which is usually powerful enough to cause
one human being to destroy another.

APPEAL by defendant from judgments sentencing defendant
to death for each of three convictions of murder in the first
degree, said judgments imposed by *Stephens, J.,* on 14 November
1985, Superior Court, WAKE County. Heard in the Supreme Court
10 November 1987.

*Lacy H. Thornburg, Attorney General, by Ellen B. Scouten,
Assistant Attorney General, for the state.*

*James L. Blackburn for defendant.*

MARTIN, Justice.

For the reasons stated below, we find the defendant's assign-
ments of error to be without merit and hold that he received a
fair trial, free of prejudicial error.

Viewed in the light most favorable to the state, the evidence
presented at trial tended to show the following: On the morning
of 12 February 1985, Callie Grimes went to look for her husband,

Jimmy, who had not come home the previous night. She sought him at a local bar, the Chief's Club, located on Highway 55 near the town of Apex. Arriving at approximately 8:15 a.m., she found the door unlocked and, upon entering, found her husband lying dead on the barroom floor. The body of Garland Williams was lying beside her husband. When Callie Grimes went behind the bar to telephone for help, she discovered the body of the third victim, the bar's owner, Charlie Ray Johnson.

Forensic evidence tended to show that the men had died no later than 5:00 a.m. Crime scene investigators determined that the wallets of the victims had been taken from them. However, they also found $9,000 in a blue bank bag belonging to Charlie Johnson and an additional $7,500 in hundred dollar bills in Johnson's coat pocket.

The autopsy of Jimmy Ray Grimes revealed four gunshot wounds. He was shot in the head three times at close range with a small-caliber gun. There was also a contact wound in the pit of his stomach where he had been shot with a large-caliber bullet. Grimes had a blood alcohol level of 0.20 percent.

Charlie Ray Johnson had been shot four times. Two large-caliber bullets had struck his trunk while two small-caliber bullets had been fired into his forehead and ear at close range. Charlie Johnson had a blood alcohol level of 0.31 percent.

Garland Williams was shot three times. A large-caliber bullet entered his back. He had two close-range head wounds, one caused by a large-caliber and one by a small-caliber bullet. His blood alcohol level was 0.19 percent.

According to the testimony of several of the bar's patrons, defendant arrived at the Chief's Club with Debra Blankenship on the afternoon of 11 February. During that afternoon and evening and into the early morning hours of 12 February, defendant and Blankenship played pool, drank beer, and used cocaine at the Chief's Club. Defendant also sold cocaine to a patron, who in turn sold it to several others at the club, and Charlie Johnson used cocaine given to him by defendant. Patrons testified that defendant had in his possession both his own .38-caliber pistol and Blankenship's .22-caliber pistol. Charlie Johnson kept a .38-caliber pistol under the bar. These guns were displayed several times in the

hours preceding the shootings. Both defendant and Johnson displayed their .38s when a man assaulted his girlfriend. Defendant followed the violent patron outside the bar to remonstrate with him, having first armed himself with a pistol. Defendant also made a display of his .38 when he went upstairs with a group of bar patrons to inject cocaine. Defendant and Johnson were observed displaying and discussing their guns, including Blankenship's .22, in the early morning hours.

J. C. Sandy was the last patron, other than defendant and Blankenship, to leave the Chief's Club. At about 2:30 a.m., he had a brief conversation with Jimmy Grimes, who came and spoke to him as he sat in his parked Jeep outside the club. Grimes told him that Charlie Johnson, who was preparing to close, was permitting defendant, Blankenship, and Garland Williams to remain in the bar but would not allow him to stay. There had been some tension between the two men because Grimes had wanted Johnson to intervene more forcefully in the boyfriend/girlfriend quarrel that had left the girlfriend with a badly bruised face. Grimes told Sandy that he would sleep in his parked car until it was time for him to go to work. He also told Sandy that he believed defendant was going to rob Charlie Johnson. Grimes and Sandy knocked on the club door and gained admittance for a brief period of time, after which they left the club. Sandy drove home. Grimes went to his car.

Debra Blankenship testified that while Sandy and Grimes were making their brief entrance into the bar, she, at defendant's request, went outside to warm up her van in preparation for their departure. Sandy saw her reenter the bar as he drove away. Blankenship testified that soon after reentering the bar she told defendant she was ready to leave and returned to the van. After waiting for him with the motor running for a little time, she turned off the engine and went to sleep in the back of the van.

When Debra Blankenship woke in the van, early on the morning of 12 February, she found that defendant was driving towards Virginia on N.C. 86. Blankenship was born and partly raised in Glade Hill, Virginia, where she had numerous kin with whom she and her immediate family had close ties. The couple drove to Glade Hill, where they picked up several cartons of stored belongings. They then drove to Daytona Beach, Florida, where

Blankenship's parents were attending the races. According to Blankenship's testimony and that of her family and kin, she sought the aid and protection of her parents because, although she loved defendant, she feared him.

Debra Blankenship testified that when she woke in the van defendant told her that he was in trouble because he had "blowed three people away." As they were driving to Glade Hill, defendant asked her to throw a package out the window of the van. It felt smooth to Blankenship and may have contained the wallets of the murder victims. He later handed her a towel and three guns — her .22, his .38, and a gun that looked to her like Charlie Johnson's .38 — and asked her to wipe them. Later he got out of the van and disposed of them. Defendant also cut up the clothes and boots he had worn at the Chief's Club and disposed of them in the woods. Blankenship had observed stains on the dungarees he had been wearing, on the pants' legs below the knees.

While in Glade Hill, defendant told Blankenship's uncle, aunt, and cousin that he had killed three people and that Debra had no part in the killings. When the couple reached Florida, defendant made the same statement to each of Blankenship's parents and to her father's niece, who had accompanied them to Daytona. Defendant asked Debra's father to help him get a car in which to flee. L. B. Blankenship refused him.

On the evening of the couple's arrival in Daytona Beach, 14 February, a man from Durham, North Carolina, who knew defendant was wanted for murder in North Carolina, saw defendant, recognized him, and informed Daytona Beach police as to his whereabouts. In the early morning hours of 15 February, Daytona Beach police entered the Blankenship hotel suite and found defendant hiding in a closet with a sawed-off shotgun. When he was advised by police to drop the gun, he neither complied nor resisted. The gun was wrested from his hands by police and he was placed under arrest.

Defendant and Debra Blankenship were jointly tried for the first-degree murders of the Chief's Club victims. Defendant was convicted of murder in the first degree based on premeditation and deliberation in all three cases. Blankenship was acquitted.

The jury found the following circumstances in aggravation in all three cases: defendant had previously been convicted of a felony involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3), and the murder for which defendant stands convicted was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11). In the case of the murder of Garland Williams the jury also found the circumstance in aggravation that the capital felony was committed for the purpose of avoiding or preventing a lawful arrest. N.C.G.S. § 15A-2000(e)(4) (1983).

The jury rejected each of the four mitigating circumstances submitted. Upon unanimously finding beyond a reasonable doubt that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty, the jury recommended that defendant be sentenced to death in each case. Judgments of execution were entered on 14 November 1985. Defendant appealed the sentences of death to this Court as a matter of right.

## I.  GUILT-INNOCENCE PHASE

[1]  Defendant first contends that the trial court erred in granting the state's motion for joinder and in denying defendant's motions to sever his trial from that of Debra Blankenship. N.C.G.S. § 15A-926(b)(2) permits joinder where the state seeks to hold each defendant accountable for the same crimes. Joinder is not permitted, however, if severance is necessary for a fair determination of guilt or innocence. N.C.G.S. § 15A-927(c)(2) (1983). Absent a showing that a defendant has been deprived of a fair trial by joinder, the trial court's discretionary ruling on the question will not be disturbed. *State v. Nelson*, 298 N.C. 573, 586, 260 S.E. 2d 629, 640 (1979), *cert. denied*, 446 U.S. 929, 64 L.Ed. 2d 282 (1980). The state argues that the defendant waived joinder because he made his motions during rather than before trial. We do not find it necessary to discuss the waiver issue because, after examining the entire record, we hold that defendant has failed to show that the trial court abused its discretion in permitting joinder or that he was deprived of a fair trial.

This Court stated in *Nelson* the test to be applied in determining whether the trial court erred in denying a defendant's mo-

tion for severance under N.C.G.S. § 15A-927(c)(2). The test is whether the conflict in the defendants' respective positions at trial is of such a nature that, considering all of the evidence in the case, defendant was denied a fair trial. 298 N.C. at 587, 260 S.E. 2d at 640. The test is not merely whether defendants have conflicting or antagonistic defenses but whether this defendant's case has been prejudiced. The *Nelson* analysis of joinder law has recently been reaffirmed in *State v. Rasor*, 319 N.C. 577, 356 S.E. 2d 328 (1987). It is defendant's contention that Blankenship's testimony was so antagonistic to his plea of not guilty as to prejudice his right to a fair trial. In *Nelson* we explained the nature of the circumstances in which defenses were to be deemed so antagonistic as to prejudice one or more of the defendants. Severance should be granted to avoid an evidentiary contest between the defendants "where the state simply stands by and witnesses 'a combat in which the defendants [attempt] to destroy each other.'" 298 N.C. at 587, 260 S.E. 2d at 640 (quoting *People v. Braune*, 363 Ill. 551, 557, 2 N.E. 2d 839, 842 (1936)). We cannot agree with defendant that he and his codefendant were pitted against each other in this fashion at his trial.

Unquestionably, Blankenship's testimony was inimical to defendant's defense in important respects. Blankenship testified to defendant's admission that he had killed three people, to his destruction of evidence, to his having stains on his dungarees which may have been blood, and to his flight to evade arrest. But Blankenship's testimony was not entirely antagonistic to defendant. She testified that he told her that he had been attacked, taken by surprise by a blow to the head by a bottle or a gun, and that this attack began the fight in which he shot three people. Her testimony suggested at least provocation and perhaps self-defense and supported defendant's denial that he was guilty of murder with premeditation and deliberation.

Nor did the state stand by and rely on Blankenship's testimony to prove its case. Various patrons of the Chief's Club contributed to the state's being able to show, independently of Blankenship's testimony, that defendant was at the club in the early morning hours of 12 February, that he was armed with two guns, and that he and Blankenship remained at the bar after all others save the murdered three had left. Forensic evidence established that the guns these witnesses saw in defendant's posses-

sion could have fired the murderous bullets. A Daytona Beach law enforcement officer testified that defendant's response to the Florida's officers' early morning appearance was to hide in a closet with a sawed-off shotgun at the ready. Relatives of Debra Blankenship testified that defendant had admitted to each of them that he, not Debra, had been responsible for the deaths. Independent of Blankenship's testimony, the state presented sufficient evidence from which a jury could have concluded that defendant was guilty of murder in the first degree.

Finally, neither prosecutorial stratagem nor the operation of court rules impaired defendant's ability to defend himself. Defendant had the opportunity, and availed himself of it, to fully cross-examine Blankenship. *State v. Lake*, 305 N.C. 143, 286 S.E. 2d 541 (1982). Nor was this a case in which defendant was prevented from giving exculpatory testimony or deprived of the opportunity to present the inculpatory testimony of his codefendant. *See State v. Boykin*, 307 N.C. 87, 296 S.E. 2d 258 (1982); *State v. Alford*, 289 N.C. 372, 222 S.E. 2d 222, *death penalty vacated sub nom. Carter v. North Carolina*, 429 U.S. 809, 50 L.Ed. 2d 69 (1976).

[2] Defendant next challenges the trial court's admission of evidence concerning the so-called "Durham incident" at the B&D Tavern in Durham on 28 December 1984, some two weeks before the Chief's Club murders for which defendant was tried. The state's evidence tended to show that the defendant and Debra Blankenship went to the B&D Tavern to shoot pool and drink beer on the night in question. While they were there, a fight broke out between two other patrons. Defendant intervened to halt the argument, but when profanely told to mind his own business by one of the men, defendant responded by pistol-whipping him. When another patron attempted to stop the beating, defendant turned on him and shot him in the stomach at point-blank range. He then made his departure with Debra Blankenship in her van, which she had warmed and readied outside the door of the bar.

The state contended that the evidence was admissible against defendant to prove his identity as the perpetrator of the Chief's Club murders. After a hearing outside the presence of the jury, the trial judge allowed the state to present the Durham incident evidence. The trial judge admitted this evidence under Rule

404(b) of the North Carolina Rules of Evidence, which lists certain permissible exceptions to the general rule that evidence of past crimes is inadmissible. The trial judge then gave a limiting instruction to the jurors, permitting them to consider this evidence solely for the purposes of establishing the identity, motive, intent, or knowledge of the person or persons responsible for the Chief's Club killings.

The general rule on the admissibility of evidence of other crimes is well stated in an often-quoted passage in Dean Brandis' treatise on evidence:

> Evidence of other offenses is inadmissible on the issue of guilt if its only relevancy is to show the character of the accused or his disposition to commit an offense of the nature of the one charged; but if it tends to prove any other relevant fact it will not be excluded merely because it also shows him to be guilty of an independent crime.

1 Brandis on North Carolina Evidence § 91 (1982). The law in North Carolina on admissibility of evidence of other crimes was set forth in *State v. McClain*, 240 N.C. 171, 81 S.E. 2d 364 (1954), and codified in N.C.G.S. § 8C-1, Rule 404. Rule 404(b) lists identity, motive, intent, and knowledge, the four purposes for which the trial judge allowed the jury to consider the Durham incident evidence, as among the exceptions which may permit evidence of other crimes to be admitted. The state's interest in the admission of this evidence with respect to defendant was principally to prove identity; for whether the killings were the work of defendant, Debra Blankenship, the two codefendants acting together, or person or persons unknown, was at the heart of this case.

As we stated in *State v. Riddick*, 316 N.C. 127, 340 S.E. 2d 422 (1986), "[t]he application of this exception requires 'some unusual facts present in both crimes or particularly similar acts which would indicate that the same person committed both crimes.'" *Id.* at 133, 340 S.E. 2d at 426 (quoting *State v. Moore*, 309 N.C. 102, 106, 305 S.E. 2d 542, 545 (1983)). *See also State v. Leggett*, 305 N.C. 213, 287 S.E. 2d 832 (1982); *State v. Thompson*, 290 N.C. 431, 226 S.E. 2d 487 (1976). Defendant protests the admission of the Durham incident evidence on the grounds that the similarities the state alleges between the Chief's Club murders and the B&D Tavern incident are insufficiently striking or bizarre

to permit the Durham evidence to fall under the Rule 404(b) exception. Both incidents, defendant insists, are devoid of any singular or signature elements that mark them off from the common run of barroom fights. Therefore, defendant argues, the Durham crime could not be properly mined for evidence probative of the identity of the Chief's Club murderer. We disagree and hold that the Durham incident testimony was properly admitted to prove that defendant committed the Chief's Club murders.

Defendant misapprehends the nature of the standard imposed by Rule 404(b) for the admission of similar crimes as evidence of identity. It is not necessary that the modus operandi of the crime the state seeks to have admitted rise to the level of the unique and bizarre. In the *Riddick* case we did have bizarre and unique signature elements common to the past crimes and the crimes the state sought to prove the defendant had committed; for example, the criminal wore a toboggan hat and also stole fresh fruit from his victims' kitchens. *Riddick*, 316 N.C. 127, 340 S.E. 2d 422. The proper application of the Rule 404(b) exception requires not the bizarre but, as the quotation from *Riddick* above makes clear, that the similarities support the reasonable inference that the same person committed both the earlier and the later crimes. 316 N.C. at 133, 340 S.E. 2d at 426. The Durham incident was sufficiently similar to the Chief's Club killings to be probative of defendant's guilt, not because of the bizarre or unique nature of the elements, but because of the repetition or reenactment in the Apex barroom of so many of the elements played out in the Durham barroom.

At both the B&D Tavern and the Chief's Club there was evidence that one of the victims was pistol-whipped. At the B&D Tavern defendant jammed his gun into the ear of the man he pistol-whipped. Jimmy Grimes, one of the Chief's Club victims, had a lacerated ear which may have been produced by the same procedure. In Durham, Randall Perry was shot in the stomach at point-blank range; this same fate befell Grimes and Charlie Johnson at the Chief's Club. In both the Durham and Apex crimes the savagery of the violence visited upon the victims was never adequately accounted for by any motive, legitimate or criminal. In both incidents the defendant employed Debra Blankenship in a supporting role, dispatching her to fetch him guns and to ready the van in which he fled the scene. Evidence of such similarities

could assist the jury in determining whether defendant was re-
sponsible for the Apex murders. There was no error in allowing
the jury to hear the Durham incident evidence for the limited
purposes for which it was admitted.

[3]   Defendant next contends that the trial court committed prej-
udicial error in ruling that there was sufficient evidence to go to
the jury on the felony murder theory based on armed robbery.
Each of the three cases was submitted to the jury on the felony
murder theory as well as murder in the first degree with premed-
itation and deliberation. The jury did not find the defendant
guilty of felony murder but, rather, based its verdicts solely on
premeditation and deliberation. We hold that there was sufficient
evidence to submit felony murder to the jury, but even if there
were not, defendant could have suffered no prejudice because the
jury did not find him guilty of any charges based on a felony
murder theory.

In support of its contention that armed robbery had been
committed, the state presented evidence that the victims' wallets
had been taken from them. Additionally, Blankenship testified
that while driving to Glade Hill, defendant had asked her to
throw a package, which may have contained the wallets, out of
the van window. Defendant protests that robbery could not have
been the principal motive of these crimes because a blue bank bag
which defendant knew contained a large sum of cash was left be-
hind. Defendant argues that the likely explanation of the removal
of the wallets is that they were taken to conceal the identities of
the murder victims, an afterthought following the commission of
the crimes. Defendant is mistaken about the nature of armed rob-
bery. The commission of armed robbery as defined by N.C.G.S.
§ 14-87(a) does not depend upon whether the threat or use of vio-
lence precedes or follows the taking of the victims' property.
Where there is a continuous transaction, the temporal order of
the threat or use of a dangerous weapon and the takings is imma-
terial. *State v. Rasor*, 319 N.C. 577, 587, 356 S.E. 2d 328, 335;
*State v. Hope*, 317 N.C. 302, 306, 345 S.E. 2d 361, 364 (1986). Fur-
ther, provided that the theft and the force are aspects of a single
transaction, it is immaterial whether the intention to commit the
theft was formed before or after force was used upon the victims.
*State v. Fields*, 315 N.C. 191, 337 S.E. 2d 518 (1985).

Even had the evidence of armed robbery been insufficient to support the submission of the felony murder theory to the jury, the defendant could not have suffered prejudice as a result. The jury declined to find the defendant guilty of any charges grounded on a felony murder theory. Where the jury has rejected an erroneously submitted charge, the error is rendered harmless. In *State v. Bryant*, 282 N.C. 92, 191 S.E. 2d 745 (1972), *cert. denied*, 410 U.S. 958, 35 L.Ed. 2d 691, *cert. denied*, 410 U.S. 987, 36 L.Ed. 2d 184 (1973), we held there was no prejudice to defendant despite the trial court's erroneous submission of the death penalty as a possible verdict to the jury because the jury returned a verdict recommending life imprisonment. Similarly, in *State v. Daniels*, 300 N.C. 105, 265 S.E. 2d 217 (1980), we vacated an involuntary manslaughter verdict because there was insufficient evidence linking the defendant to the killing, but held the defendant was properly convicted of armed robbery. The improper submission of the manslaughter verdict did not infect the armed robbery conviction with prejudice, because the defendant was properly convicted of armed robbery and because the penalty imposed exceeded the penalty for involuntary manslaughter.

[4] Defendant next contends that it was prejudicial error for the trial court to instruct the jury on flight as evidence of guilt because there was insufficient evidence to support the instruction. We hold that the instruction on flight was properly given.

The trial judge provided the jury with the following instruction on flight:

Ladies and Gentlemen, the State contends that both defendants fled North Carolina after February the 12th of 1985.

I instruct you that evidence of flight may be considered by you together with all other facts and circumstances in these cases in determining whether the combined circumstances amount to an omission or show a consciousness of guilt.

However, proof of this circumstance is not sufficient in itself to establish the defendants' guilt.

. . . .

Therefore, it must not be considered by you as evidence of premeditation or deliberation.

A review of the evidence in the record reveals that there was sufficient evidence of flight to support this instruction. Defendant and Blankenship drove from Apex to Glade Hill, Virginia, arranging en route to get $3,400 owed Blankenship from her brother. While in Glade Hill, defendant responded to urging by Blankenship's uncle that he return to Durham to straighten out the charges arising from the Durham incident by saying, "I can't, I've killed three people." They stayed in Glade Hill for little more time than it took to gather up some stored personal belongings and to learn that roads to the north and west were impassable because of snow. They then headed south to Florida, where Blankenship's father testified defendant asked him to help get a car that would not be registered in defendant's name. Defendant told L. B. Blankenship that if he would help him get a car, he would sign a notarized statement that Debra had not had a hand in the crimes. When the Daytona Beach police entered the Blankenship hotel suite where defendant was staying, he was discovered hiding in a closet with a sawed-off shotgun at the ready. While defendant did not actively resist arrest, he did not comply with police orders to drop the gun. Police had to wrest the weapon from his hands to place him under arrest.

We stated the law in this jurisdiction in *State v. Irick*, 291 N.C. 480, 494, 231 S.E. 2d 833, 842 (1977), where we said: "So long as there is some evidence in the record reasonably supporting the theory that defendant fled after commission of the crime charged, the instruction is properly given." Defendant insists that there is another reasonable explanation for his course of action. He argues that what the state presented as flight was simply the continuation of the pattern of behavior that defendant and Blankenship had exhibited prior to the Chief's Club incident: having no fixed address, they had been travelling from town to town. But, as we made clear in *Irick*, whether or not there is any plausibility in this alternative explanation can have no bearing on the propriety of the challenged instruction. "The fact that there may be other reasonable explanations for defendant's conduct does not render the instruction improper." 291 N.C. at 494, 231 S.E. 2d at 842.

We find no prejudicial error in the guilt phase of defendant's trial.

## II. SENTENCING PHASE

[5] The defendant contends that the trial court committed prejudicial error in the sentencing proceedings in submitting to the jury the aggravating circumstance that the murder of Garland Williams was committed for the purpose of avoiding or preventing lawful arrest. The defense contends that the state did not present sufficient competent evidence to justify the submission of this factor. We hold to the contrary.

N.C.G.S. § 15A-2000(e)(4) states that the jury may consider as an aggravating circumstance that "the capital felony was committed for the purpose of avoiding or preventing a lawful arrest." This Court has upheld the submission of this circumstance in aggravation in two types of situations. It has been upheld in circumstances where a murder was committed to prevent the murder victim from capturing the defendant. Such was the case in *State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788 (1981), where a state trooper was shot to prevent arrest of the defendant. The submission of this factor has also been upheld where a purpose of the killing was to eliminate a witness. Such was the case in *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979). The issue before us is whether the state presented sufficient evidence that Garland Williams was murdered so that he could not bear witness against defendant to justify the submission of this aggravating circumstance to the jury.

In *Goodman*, we made clear that the aggravating circumstance of witness elimination may be presented to the jury only when evidence in addition to the mere fact of death is presented in support of it. We stated as a requirement in *Goodman* that "there must be evidence from which the jury can infer that at least one of the purposes motivating the killing was defendant's desire to avoid subsequent detection and apprehension for his crime." 298 N.C. at 27, 257 S.E. 2d at 586. Such evidence was presented at defendant's trial. Chief's Club regulars testified that Garland Williams habitually spent his evenings sitting at the bar, alternately drinking beer and falling asleep or passing out with his head on his arms, sleeping and waking, only to fall asleep again. On the night of the Chief's Club murders, Garland Williams had embarked upon a typical evening of drinking and dozing at the bar. Another habitue of the Chief's Club testified that he

observed Williams passed out at the bar, with his head on his arms, at approximately 1:30 a.m. on the morning of 12 February. When J. C. Sandy, the last patron to leave the bar, went briefly back inside with Jimmy Grimes shortly before 3:00 a.m., Williams was once more awake.

The state also presented evidence which tended to show that Williams was sitting facing the bar, either asleep or immobilized with fear, when he was shot. Forensic evidence was presented which suggested that Williams was shot from behind. The trajectory of all three bullets which hit him, one in the back and two in the head, was upward, lending support to the hypothesis that he was shot in the back while asleep or while simply arrested in fear at the bar, in the position in which he had been when wakened. There was no evidence of any struggle preceding his death. Apparently he had not been engaged in any active resistance to his killer, as had Jimmy Grimes who had defensive wounds on his right hand and arm. Unlike Charlie Johnson, who had weapons behind the bar, there was no evidence that Garland Williams was armed and could have presented a threat to his killer. On the basis of this evidence the state argued that Williams was killed while in a defenseless position, to eliminate him as a witness to the killings of Grimes and Johnson.

Defendant contends that the *Goodman* requirement—that evidence in addition to the mere fact of death must be presented if witness elimination is to be legitimately submitted as a circumstance in aggravation—can only be satisfied by a statement made by the defendant prior to the shooting to the effect that fear of arrest was a motivating factor. While it is true that such statements have been adduced in evidence to support the factor of witness elimination in the few witness-elimination cases that have come before this Court, we have nowhere held that such statements are essential to establish this aggravating circumstance. *State v. Lawson*, 310 N.C. 632, 314 S.E. 2d 493 (1984), *cert. denied*, 471 U.S. 1120, 86 L.Ed. 2d 267 (1985); *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983); *State v. Williams*, 304 N.C. 394, 284 S.E. 2d 437 (1981), *cert. denied*, 456 U.S. 932, 72 L.Ed. 2d 450 (1982); *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569. In the case before us, the physical evidence, coupled with testimony about the drinking habits of Garland Williams and his behavior on the night he was murdered, is sufficient to put the aggravating circumstance before the jury.

[6]   Defendant also protests the propriety of the submission of witness elimination as an aggravating circumstance on the grounds that the jury was asked to consider two aggravating circumstances based on the same evidence. Defendant argues that the same evidence with which the state supports witness elimination is also presented to establish that Garland Williams was killed in a course of violent conduct in which Jimmy Grimes and Charlie Johnson were killed. In *Goodman*, we held that the submission of two issues on the same evidence is improper because it is "an unnecessary duplication of the circumstances enumerated in the statute, resulting in an automatic cumulation of aggravating circumstances against the defendant." 298 N.C. at 29, 257 S.E. 2d at 587. However, the *Goodman* case does not exhaust the learning that this Court brings to bear on the question of whether the submission of both witness elimination and violent course of conduct was proper in defendant's case.

In *Hutchins*, 303 N.C. 321, 279 S.E. 2d 788, we elucidated the rule stated in *Goodman*. There we said that "there is no error in submitting multiple aggravating circumstances provided that the inquiry prompted by their submission is directed at distinct aspects of the defendant's character or the crime for which he is to be punished." 303 N.C. at 354, 279 S.E. 2d at 808. In *Hutchins*, we upheld the submission of the aggravating circumstances of committing murder against an officer performing his lawful duties and of resisting lawful arrest. Justice Britt explained that while the first-mentioned circumstance looked to the underlying factual basis of the crime, the second forced the jury to consider the defendant's motivation. 303 N.C. at 355, 279 S.E. 2d at 809. Such is the case here. The circumstance of violent course of conduct directs the jury's attention to the factual circumstances of defendant's crimes. The circumstance of witness elimination requires the jury to consider not defendant's actions but his motive in shooting a man in a defenseless posture. There was no error in submitting both of these aggravating circumstances to the jury.

[7]   Defendant next contends that the trial court committed prejudicial error in allowing the state to present excessively in-depth testimony to establish the aggravating circumstance "that the defendant had previously been convicted of a felony involving the use or threat of violence to the person." Defendant protests that the challenged testimony, which concerned a prior armed robbery

conviction, led the jury to focus on the defendant's guilt for this past crime to the detriment of its proper task of determining the sentences for the Chief's Club murders. Defendant argues that because there can be no cavil that armed robbery involves the threat or use of force, the state did not need to, and should not have been permitted to, go beyond the simple admission of the court record of his prior conviction.

The issue of the propriety of limiting the state in these circumstances to the introduction of the defendant's record has been settled in this jurisdiction. In *State v. McDougall*, 308 N.C. 1, 301 S.E. 2d 308, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 173 (1983), we reaffirmed the rule in *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied*, 463 U.S. 1213, 77 L.Ed. 2d 1398 (1983), holding that the state may not be limited to the introduction of a record of prior conviction when attempting to prove a circumstance in aggravation, whether or not the defendant has stipulated to the record of conviction. In *McDougall* we noted "the state's duty [under N.C.G.S. § 15A-2000(c)(1)] to prove each aggravating circumstance beyond a reasonable doubt. . . . [T]he state cannot be deprived of an opportunity to carry its burden of proof by the use of competent, relevant evidence." 308 N.C. at 22, 301 S.E. 2d at 321. *See also State v. Brown*, 315 N.C. 40, 337 S.E. 2d 808 (1985), *cert. denied*, 476 U.S. 1165, 90 L.Ed. 2d 733 (1986).

Nor do we find any evidence in the record to support defendant's claim that the testimony to which he objects was excessively in-depth or prejudicial. The testimony in question was that of a retired Durham police officer who had investigated the armed robbery for which defendant was convicted and who had arrested defendant for the crime. Retired Officer King read from the police report he made at the time of the investigation and arrest eighteen years prior to defendant's trial for the Chief's Club murders. The trial judge provided adequate supervision of the examination and cross-examination of this witness. *Greer v. Whittington*, 251 N.C. 630, 111 S.E. 2d 912 (1960). Indeed, the cross-examination of Officer King allowed defendant to bring certain facts to the attention of the jury which were likely to induce it to form a more favorable impression of defendant's character than would have been the case if it had learned nothing more than that he had a previous conviction for armed robbery. From the cross-examination the jury learned that defendant injured no one in the

armed robbery committed eighteen years before, that he did not fire his gun, that he confessed his crime, and that he gave officers no trouble whatsoever when escorted from Philadelphia, where he was arrested, back to this state.

[8]   Defendant next argues that the trial court committed reversible error in excusing for cause certain jurors who expressed an unwillingness to impose the death penalty, because this procedure produces a jury biased in favor of conviction and prone to find the defendant guilty. Defendant concedes that his constitutional challenge has been considered and rejected by this Court on several recent occasions. *State v. Gladden,* 315 N.C. 398, 340 S.E. 2d 673, *cert. denied,* --- U.S. ---, 93 L.Ed. 2d 166 (1986); *State v. Young,* 312 N.C. 669, 325 S.E. 2d 181 (1985); *State v. Avery,* 299 N.C. 126, 261 S.E. 2d 803 (1980). The United States Supreme Court has also rejected the position taken by defendant. *Lockhart v. McCree,* 476 U.S. 162, 90 L.Ed. 2d 137 (1986). Defendant has not presented us with reasons which would compel us to review our position, and we decline to do so.

[9]   Defendant next protests that the submission of the aggravating circumstance that the murder of Jimmy Ray Grimes was "especially heinous, atrocious or cruel" was prejudicial error. He contends that there was insufficient evidence to support the submission of this circumstance in aggravation to the jury. We hold that there was sufficient evidence to submit this circumstance to the jury, but even if there were not, defendant could have suffered no prejudice as a result of the submission because the jury answered that this aggravating circumstance was not present.

[10]   Defendant next contends that the North Carolina death penalty statute, N.C.G.S. § 15A-2000, is unconstitutional, is applied in a discriminatory manner, is vague and overbroad, and involves subjective discretion, and thus violates the eighth and fourteenth amendments to the United States Constitution and article I, sections 19 and 27 of the Constitution of North Carolina. As defendant concedes, we have repeatedly upheld the constitutionality of the statute against these challenges. *E.g., State v. Gladden,* 315 N.C. 398, 340 S.E. 2d 673; *State v. Brown,* 315 N.C. 40, 337 S.E. 2d 808; *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied,* 448 U.S. 907, 65 L.Ed. 2d 1137, *reh'g denied,* 448 U.S. 918, 65 L.Ed. 2d 1181 (1980). The discrimination issue has also recently

been decided against defendant by the United States Supreme Court in *McClesky v. Kemp*, 481 U.S. ---, 95 L.Ed. 2d 262 (1987). We overrule this assignment of error.

## III.  PROPORTIONALITY

[11]  Finally, we turn to the solemn duty which devolves upon us under N.C.G.S. § 15A-2000(d)(2) to carefully review the record in every capital case to determine whether the death sentence has been properly imposed. The statute requires us to review (1) whether the record supports the jury's findings of any aggravating circumstance or circumstances upon which the sentencing court based its sentence of death; (2) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. After a careful review of the entire record, we find that the evidence supports the three aggravating circumstances that were found by the jury. We further conclude that there is nothing in the record which indicates that the sentences of death were influenced by passion, prejudice, or any other arbitrary factor. We must now discharge our last statutory duty: the review of whether the sentences imposed on the defendant are disproportionate to the punishment imposed in similar cases.

To make our determination, we employ the methodology established in *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704 (1983), which mandates that we compare the case under review to "similar cases" as defined in the *Williams* opinion:

> In comparing "similar cases" for purposes of proportionality review, we use as a pool for comparison purposes *all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*Id.* at 79, 301 S.E. 2d at 355. The pool includes only those cases which have been affirmed by this Court. *State v. Jackson,* 309 N.C. 26, 45, 305 S.E. 2d 703, 717 (1983). In making our determination we do not "necessarily feel bound . . . to give a citation to every case in the pool of 'similar cases' used for comparison." *Williams,* 308 N.C. at 81, 301 S.E. 2d at 356. Our task has been well described in *State v. Lawson,* 310 N.C. 632, 648, 314 S.E. 2d 493, 503:

> In essence, our task on proportionality review is to compare the case at bar with other cases in the pool which are roughly similar with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and defendant's character, background, and physical and mental condition. If, after making such a comparison, we find that juries have consistently been returning death sentences in the similar cases, then we will have a strong basis for concluding that a death sentence in the case under review is not excessive or disproportionate. On the other hand if we find that juries have consistently been returning life sentences in the similar cases, we will have a strong basis for concluding that a death sentence in the case under review is excessive or disproportionate.

The jury found defendant guilty of three first-degree murders committed with premeditation and deliberation. In each case the jury concluded that the victim's murder was aggravated by being part of a violent course of conduct in which two other men were killed. In the case of the murder of Garland Williams, the jury also concluded the purpose of avoiding or preventing lawful arrest was an additional aggravating circumstance. The jury found no mitigating circumstances. Two qualities suffuse these crimes. They are especially cold-blooded because of the absence of any motive of the sort which is usually powerful enough to cause one human being to destroy another. Without any indication that the interests or passions of defendant were very deeply engaged, three men were shot, one of them beaten, and then all were dispatched, executioner style, by multiple close-range shots to the head. Further, the Durham incident evidence, as well as evidence of defendant's quick gun-toting involvement in a lover's quarrel at the Chief's Club which became an assault, paints a picture of defendant as a man shockingly ready to impose himself as an armed

arbiter, to convert others' quarrels into quarrels of his own, and to go the ultimate length to dominate a situation.

We cannot find as a matter of law that the death sentences meted out to defendant are disproportionate to the penalty imposed in similar first-degree murder cases. For comparison purposes we turn to the other cases in the *Williams* pool which involved multiple first-degree murders. There are nine such cases. In each case the jury recommended death and this Court affirmed the sentence. *State v. Robbins*, 319 N.C. 465, 356 S.E. 2d 279, *cert. denied*, --- U.S. ---, 98 L.Ed. 2d 226 (1987); *State v. Noland*, 312 N.C. 1, 320 S.E. 2d 642 (1984), *cert. denied*, 469 U.S. 1230, 84 L.Ed. 2d 369, *reh'g denied*, 471 U.S. 1050, 85 L.Ed. 2d 342 (1985); *State v. Gardner*, 311 N.C. 489, 319 S.E. 2d 591 (1984), *cert. denied*, 469 U.S. 1230, 84 L.Ed. 2d 369 (1985); *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304; *State v. Brown*, 306 N.C. 151, 293 S.E. 2d 569, *cert. denied*, 459 U.S. 1080, 74 L.Ed. 2d 642 (1982); *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983); *State v. Williams*, 305 N.C. 656, 292 S.E. 2d 243, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983); *State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788; *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510. The record discloses no reason to treat this defendant differently than those multiple killers who have preceded him before the bar of justice.

We hold as a matter of law that the death sentences imposed against defendant are not disproportionate within the meaning of N.C.G.S. § 15A-2000(d)(2). Upon this holding, the sentences of death are affirmed. *State v. Jackson*, 309 N.C. 26, 305 S.E. 2d 703.

No error.